1    49
23c 237

JOHN L. ARMSTRONG, PLAINTIFF IN ERROR, v. THE LARI-
MER COUNTY DITCH CO., DEFENDANT IN ERROR.

1. CONSTRUCTION OF CONSTITUTIONS.—A constitution, not being the
   beginning of a community, nor the origin of private rights, is to
   be construed as declaratory of and not destructive of the rights
   and powers enjoyed by the people before its adoption.
2. CONSTITUTIONAL RECOGNITION OF EXISTING RIGHTS.—The right to
   water for purposes of irrigation existed prior to legislation on the
   subject, and prior appropriations of water were recognized by the
   constitution, but in no way attempted to be affected by its pro-
   visions.
3. A RIGHT TO THE USE OF WATER IS PROPERTY.—The right to the
   use of water secured by legal appropriation is property, and a
   proper construction of the various provisions of the constitution
   on the subject harmonizes that instrument with the declaration of
   the Bill of Rights, "that private property shall not be taken or
   damaged for public or private use without just compensation."
4. SUPERIORITY OF WATER RIGHTS ACQUIRED BEFORE CONSTITUTION.—
   The provisions of §§ 5, 6, art. XVI., of the constitution, relating to
   the unappropriated waters of the natural streams, and the right of
   appropriation to various uses, with preference in favor of "those
   using the water for domestic purposes," do not authorize inter-
   ference with the rights of prior appropriators for irrigating pur-
   poses, whose rights vested before the adoption of the constitution,
   in order to supply later comers with water for domestic uses.

*Error to District Court of Larimer County.*

DEFENDANT in error is a corporation operating under the
general incorporation law of the state for constructing, op-
erating, and maintaining a ditch for irrigating, agricultural,
domestic, and manufacturing purposes. In April, 1881, it
commenced the construction of its ditch from the Cache la
Poudre river, at a point near the foot of the mountains, to
run in an easterly and southeasterly direction. There were
also seven contemplated or projected reservoirs for the stor-
age of water. The ditch was in process of construction for
several years, and some time during the year 1888 was 60
miles in length, having at its head a carrying capacity of

about 470 cubic feet of water per second.    At the time of
the institution of this suit very few, if any, of the contem-
plated reservoirs along the line of the ditch for storing the
supply of water had been built.

By an adjudication in April, 1882, to establish the priori-
ties to the use of water in the district where the ditch was
located, in which a decree was entered, and by subsequent
and supplemental proceedings, one in April, 1884, and one
in October, 1885, in which the decree was amended, it was
finally adjudicated and decreed that the ditch of the defend-
ant in error should be ditch No. 63, with priority No. 100,
with capacity computed at 463 cubic feet per second.

Between the time of the commencement of the construc-
tion of the ditch and the bringing of this suit a large num-
ber of settlers, estimated at near 200, many with families,
settled under the ditch, dependent upon the defendant for
water for irrigating and domestic purposes to be supplied
from its ditch under contracts made with the corporation.
It is shown in evidence that the large extent of country
through which the ditch was excavated was an arid, alkaline
waste,—a veritable desert.    Before the supposed appropria-
tion of water to the ditch in question there had been from
the Cache la Poudre river 99 appropriations of water, dating
from the earliest settlement of the country down to that time,
and each and all had been decreed priority over the ditch in
question.    Priorities from 1 to 78 inclusive were for water
appropriated prior to January 1, 1876, and aggregated over
2300 cubic feet of water per second.    On the 4th day of
May, 1888, as shown by the evidence, there was but 360
cubic feet of water per second in the river.    From that time
on to the close of the irrigating season, with the exception
of two short freshets, lasting but a few hours, the water va-
ried from 250 to 800 cubic feet per second.

The plaintiff in error, during the year 1888, was water
commissioner of the district in which defendant's ditch was
situated, and, in his official capacity, charged with the appor-
tionment and distribution of water according to the appro-

priations and priorities, as adjudicated and decreed.  Early in the season, by reason of the scarcity of water in the stream, and its inadequacy to supply earlier appropriations, he ordered the head-gates of defendant's ditch closed, and the water was shut out.

This suit was instituted against the water commissioner, plaintiff in error, by filing a complaint on the 4th day of, May, 1888, for an injunction restraining him from closing the ditch, and for a decree that the ditch be entitled to water sufficient for the domestic use of those who were alleged to be dependent upon it.  On the day the complaint was filed the following order was made: "Upon the filing of this complaint in the office of the clerk of the district court of Larimer county, Colorado, and also upon the filing of an undertaking in the sum of one thousand dollars, conditioned as required by law, with good and sufficient sureties, to be approved by the clerk, that a writ of injunction issue commanding the defendant, his associates and employees, immediately to raise the head-gate of the ditch or canal mentioned in the complaint, so that a sufficient amount of water may enter and flow into said ditch to supply the consumers of water therefrom with water for domestic purposes, according to its priority No. 100, as heretofore determined by the decree of the court, and also commanding him and them to keep said head-gate raised until further order in the premises.  Allowed at Fort Collins this 4th day of May, 1888,"—and a preliminary writ of injunction was issued and served.

A trial was had, and, on November 5th, the following final decree was entered: " This cause having heretofore come on to be finally heard upon the pleadings and the evidence, as well that on part of the defendant as that in behalf of the plaintiff, and the court having heard the same and the argument of counsel thereon, and having taken the matter under consideration for further advisement, and having duly considered the same, and being now fully advised in the premises, doth find the issues for the plaintiff.  And the court doth specially find from the pleadings and evidence aforesaid that,

at the time of the commencement of this action, the plaintiff
was, and still is, a corporation duly organized for, and, among
other things, engaged in, the business of conveying and dis-
tributing from the Cache la Poudre river, to and for the use
of persons residing along the line of its canal, water for do-
mestic purposes; that the plaintiff's said canal is situate in
water district No. 3, and is some sixty miles in length; that the
persons aforesaid residing along the line of said canal, at the
time of the commencement of this action, were and still are,
to a great measure, dependent upon the plaintiff and its said
canal for water suitable and fit for domestic purposes, and, in
many instances, are wholly dependent thereon for water for
such purposes; that, at the time of the commencement of this
action, there was flowing in and down said river sufficient
water to supply the reasonable needs and demands of all
appropriators and users of water therefrom for domestic pur-
poses, if carefully distributed, and with no more waste than
is naturally incident to the customary manner of distributing
water through open ditches and canals, but the water of said
river was insufficient for the service of all desiring the use
of the same for various other beneficial uses; that the plaint-
iff has and controls a large reservoir for the storage of water
situate upon the said river above the head-gate of its said
canal, wherein it is wont, from time to time, to store a large
amount of surplus water, to be afterwards drawn off and
turned into its canal for beneficial uses; that the defendant,
as water commissioner of water district No. three, (3,) had
shut down and closed, and threatened to keep shut down and
closed, the head-gate of the plaintiff's said canal, and had
thereby deprived the plaintiff of the means of obtaining water
wherewith to supply the same to the persons so dependent
upon it for water for domestic purposes, save at such times
when, by reason of increased flow of water in the river, the
plaintiff may be entitled to take water therefrom under and
by virtue of its appropriation thereof for agricultural purposes.
And the court doth further find, as a matter of law, that when
the waters of said river are not sufficient for the service of

all those desiring the use of the same, those using the water for domestic purposes are entitled to divert and take the same, according to their respective priorities of appropriation thereof, for such purposes, notwithstanding any appropriation thereof by persons using the same for any other purpose. And the court doth further find and declare, as a matter of law, that the uses to which water may be applied, which are comprehended by the term 'domestic purposes,' hereinbefore employed and occurring in the constitution of this state, are as follows, and none other, that is to say: Household purposes, including water for drinking, washing, bathing, culinary purposes, and the like; water for such domestic animals as are used and kept about the house, such as work animals and cows kept to supply their owners and their families with dairy products; and such other uses, not being either agricultural or mechanical, as directly tend to secure and promote the healthfulness and comfort of the home. Wherefore, it is ordered and decreed by the court that the injunction heretofore allowed herein and served upon the defendant be, and the same is, hereby so modified as to operate and be effectual only as hereinafter decreed. It is ordered and decreed by the court that the defendant, John L. Armstrong, water commissioner in and for water district No. three, (3,) his successors in office, deputies, agents, and servants, do absolutely desist and refrain from closing or keeping closed the headgate of the canal of the plaintiff, the Larimer County Ditch Co., for any period exceeding twenty (20) days at a time, and he is and they are strictly enjoined, required, and commanded, whenever water has been by them or any of them prevented from flowing from the Cache la Poudre river into said canal for the period of twenty (20) days, and he or they are thereunto requested by the plaintiff, to permit sufficient water to flow into said canal from said river for a period of not less than five (5) days, to supply water for domestic purposes to all persons residing along the line of said canal and dependent thereon for water for such purposes, and to enable such persons to fill cisterns and such like receptacles for

the storage of water for such purposes: provided, that there be water flowing in said river to which other persons are not entitled by prior appropriation thereof for domestic purposes, and, further, that the plaintiff shall not have water at such time stored in its said reservoir. It is ordered and decreed that the plaintiff shall not, as against the rights of any prior appropriation of water for agricultural purposes, at any time when it has water stored in its said reservoir, be entitled to divert or take any water from the said river, not flowing down from its said reservoir.

"It is further ordered and decreed by the court that, except as herein and hereby modified, the injunction heretofore allowed be, and the same is, made perpetual; saving and reserving, however, to each party the right to move the court at any time so to modify this decree as to make it conform to the provisions of any law that may hereafter be enacted by the general assembly of this state prescribing regulations relating to the distribution of water for domestic purposes. It is further ordered that each party pay its and his own costs incurred herein."

Mr. J. M. FREEMAN and Mr. H. W. HAYNES, for plaintiff in error.

Mr. FRANK J. ANNIS and Mr. LYMAN PORTER, for defendant in error.

REED, J. The question presented in this case for determination is of very grave importance,—purely a question of law; there was no controversy in regard to the facts. The testimony in this case establishes the facts that, prior to the inception of the scheme to construct the ditch of the defendant in error, and prior to January 1, 1876, water from the stream had been legally appropriated exceeding in volume 2300 cubic feet per second, while the volume of the stream for the irrigating season of 1888 did not average over 700 cubic feet per second. Perhaps that season was an ex-

ceptionally dry one, but it is not so shown. The canal in question, at its easterly extremity, 60 miles in a desert from the source of supply, was built in 1885 or later; and taking the testimony of the defendant in error as true, that that section of the country is absolutely uninhabitable unless supplied with water for domestic purposes from the canal, we must conclude that the settlers for whose use water was required in this suit settled in those years, as, from the facts shown, such settlements could not have antedated the completion of the canal, from absolute lack of water to sustain animal life. Here we find, at a time when the stream was not supplying to those who had legally appropriated the water from 10 to 25 years before to exceed one third of the supply adjudicated and decreed, the defendant in error applying to the courts for a further reduction and diversion for the benefit of the latest comers. All such attempts, especially when successful, are subversive of natural and statutory law and rights and the constitution of the state, and could not possibly be tolerated in a court of equity except upon the ground of the inexorable necessity of having water to sustain human life. On no other ground could the original plaintiff have had any standing in a court of equity.

The question to be determined is, did the court err in decreeing the right of defendant in error to divert the water of the stream for distribution to settlers and patrons for domestic use, paramount and superior to the rights of those who had appropriated the same water for purposes of irrigation?

In examining the right to the use of water for domestic purposes, under the facts of this case, and under the climatic and physical conditions incident to an arid, semi-desert country, very little assistance can be obtained from common-law sources, or the adjudications of older states where the same conditions do not exist. Doctrines of common law declaratory of the rights of riparian proprietors have very limited, if any, application. Before any general organization, territorial or otherwise, was or could have been had, a tide of

emigration poured into the region comprised in the present state, and over the entire west.    It was found an arid, semi-desert country.    The land could only be made productive by the artificial use of water.    The country was without law, but each individual brought with him the principles of equity and justice which were a part of his education.    It was soon found that the water of the streams was inadequate to supply all the land.    They found a new climate, new conditions calling for new laws applicable to the conditions.    The first comer settled near the stream.    In the absence of surveys he designated by landmarks the boundaries and extent of his occupation of land.    He diverted—appropriated by such diversion—a certain amount of water from the stream, supposed to be sufficient.    Others settled near him upon the same stream, and made a like appropriation.    In time there were agricultural settlers enough to organize and establish a local government, and a series of rules or laws were adopted, perhaps in many instances crude and inartificially drawn, but embodying principles of equity and justice.    They were recognized and obeyed, the settlers recognizing, as before stated, a fact which later corporations and settlers have not yet apparently recognized, or, if recognized, have disregarded, that the supply of water in the streams was not sufficient for all the land.    Instead of parceling it out generally and making it practically valueless to any, following the course of California and other earlier settled territories where the same conditions existed, they adopted the only rule founded in equity that could be rightfully adopted in the premises, viz., that of prior appropriation, such appropriation to be controlled and limited.    Such prior appropriation was so much as could be beneficially used upon the land for which the appropriation was made.    This was the general, well-regulated custom, hence a law, prior to and at the time of the organization of the territory; and, in the organic act creating the territory, it is said, (section 6:) "Nor shall any law be passed impairing the rights of private property."

The right to water by prior appropriation was recognized

by the first legislature of the territory, (see Laws 1861, p. 67,) and such rights continued to be recognized during the entire territorial existence. The general government, in which was the fee to both land and water at the time of the settlement, and for many years after, acquiesced in the disposition of the water according to local customs, and, in July, 1866, passed an act in which it provided (section 9) " that whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same." The right to the water in the streams of Colorado, by prior appropriation, antedated any legislation. It was the common law of the people, and legislation, both national and territorial, was but a recognition declaratory of the right as it had theretofore and then existed. Neither in any territorial or national legislation do we find any provision or declaration of rights to water by appropriation, or to be acquired in any other manner, for domestic use. It is first found in the constitution of the state.

Although water for domestic purposes is a necessity, and its use for that purpose a primary use, it seems that, from the small quantity required, and its use so inconsiderable compared with the quantity required for irrigation, it was regarded as incidental. Article 16, § 5, is as follows: " The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided." And article 16, § 6: " The right to divert unappropriated waters of any natural stream for beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose ; but, when the waters of any natural stream are not sufficient for the service of all those desiring the use

of the same, those using the water for domestic purposes shall have the preference over those claiming for any other purpose, and those using the water for agricultural purposes shall have preference over those using the same for manufacturing purposes."

The error into which the learned judge seems to have fallen was in regarding these constitutional provisions as retrospective, and so far retroactive as to impair, if not destroy, property rights acquired long before its adoption. Such cannot be its construction. It must be construed to be declaratory of, and not destructive of, the rights and powers enjoyed by the people before its adoption. In the language of Mr. Webster, the great expounder of constitutional law: " Written constitutions sanctify and confirm great principles, but the latter are prior in existence to the former." 2 Webst. Works, 392.

In *Hamilton v. County Court*, 15 Mo. 13, it is said: " What is a constitution, and what are its objects? It is easier to tell what it is not than what it is. It is not the beginning of a community, nor the origin of private rights; it is not the fountain of law, nor the incipient state of government; it is not the cause, but consequence, of personal and political freedom; it grants no rights to the people, but is the creature of their power, the instrument of their convenience. Designed for their protection in the enjoyment of the rights and powers which they possessed before the constitution was made, it is but the frame-work of the political government, and necessarily based upon the pre-existing conditions of laws, rights, habits, and modes of thought." And the language is quoted and adopted by Judge Cooley. Const. Lim. 47.

And in regard to water rights by prior appropriation the supreme court of this state has asserted the same general principle in *Coffin v. Ditch Co.*, 6 Colo. 446, in terse and comprehensive language, where it is said: " The right itself and the obligation to protect it existed prior to legislation on the

subject of irrigation." See, also, *Strickler v. City of Colorado Springs*, 16 Colo. 61.

By section 5 it will be seen that the prior appropriations of water were recognized, and in no way attempted to be affected, by the provisions of the constitution. The language is, "the water of every natural stream, not heretofore appropriated, * * * is hereby declared to be the property of the public," etc., and, by section 6, "the right to divert any unappropriated waters of any natural stream," etc., clearly showing that the provisions of the constitution were only to operate in the future, and only upon the water that was unappropriated at the time of their adoption. It is a well-settled rule of construction that all parts of an instrument are to be construed together, and harmonized if possible. To give the clause of section 6 the construction claimed would not only make it contradictory to the first part of the same section, but contradictory of section 5, and directly in conflict with section 15 of article 2, (bill of rights,) which declares "that private property shall not be taken or damaged for public or private use without just compensation."

It follows from what has been said that the court erred in construing the section of the constitution as authorizing an interference, impairment, or injury of the rights of prior appropriators for irrigating purposes vested before the adoption of the constitution, for the purpose of supplying water for domestic purposes to later comers. See *Strickler v. City of Colorado Springs*, *supra*. The suit as made should have been at once dismissed for want of equity. The right to the use of water is property ; the title accrues by legal appropriation, and becomes vested as of the date of such appropriation. To divest such right and confer it upon another without compensation would be clearly an infraction of constitutional guaranties, and the inequitable character of the decree becomes at once apparent.

For the reasons above stated the decree should be reversed, and the suit dismissed.

*Reversed.*