CONCERNING the APPLICATION FOR WATER RIGHTS OF TURKEY CAÑON RANCH LIMITED LIABILITY COMPANY, As Amended By the First and Second Amendments to Application in El Paso County.

Ethel SHIROLA, Matt Shirola and Karen Shirola, Larry Lasha and Dorothy Lasha, Richard Guy and Pamela Guy, Wendy Drew and David Anderson, Greg Dickey and Tami Dickey, Evelyn Ellis, Tony Heslop and Tuesday Heslop, Will King and Jeanne King, Hans Liebrich and Hilde Liebrich, Peter Cook and Rhonda Svoboda, Joe Macaluso and Pat Macaluso, Mike Landry and Linda Landry, Jim Dickey and Sydney Dickey, Larry Adams and Karen Adams, and Paul Darrah and Edie Darrah, Appellants,

v.

TURKEY CAÑON RANCH LIMITED LIABILITY COMPANY; and Steven J. Witte, Division Engineer, Water Division No. 2, Appellees.

No. 96SA74.

Supreme Court of Colorado,
En Banc.

April 28, 1997.

As Modified on Denial of Rehearing
May 19, 1997.

740

MacDougall Law Office, M.E. MacDougall, Julianne M. Woldridge, Henry D. Worley, David I. Liberman, Colorado Springs, for Appellants.

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Jennifer L. Gimbel, Deputy Attorney General, Lee E. Miller, First Assistant Attorney General, Steven O. Simms, Assistant Attorney General, Natural Resources Section, Denver, for Appellee State Engineer and Division Engineer, Water Division No. 2.

Felt, Houghton & Monson, LLC, James G. Felt, Steven T. Monson, James W. Culichia, Colorado Springs, for Appellee Turkey Cañon Ranch Limited Liability Company.

Duncan, Ostrander & Dingess, P.C., John M. Dingess, Lynn B. Obernyer, Denver, for Amicus Curiae City of Aurora, Colorado, Acting By and Through its Utility Enterprise.

Grant, Bernard, Lyons & Gaddis, Jeffrey J. Kahn, Steven P. Jeffers, Longmont, for Amicus Curiae Park County and Upper South Platte Water Conservancy District.

Baker & Hostetler, Kenneth J. Burke, L. Andrew Cooper, Denver, for Amicus Curiae Park County Sportsmen's Ranch.

Law Offices of Alison Maynard Paul Upsons Alison Maynard Denver, for Amicus Curiae Park County Water Preservation Coalition.

Justice KOURLIS delivered the Opinion of the Court.

Turkey Cañon Ranch Limited Liability Company (Turkey Cañon) seeks to develop a subdivision on 323 acres of land in El Paso County. In order to provide water for the subdivision, Turkey Cañon filed a water application with the District Court, Water Division 2 (water court) in February 1994, seeking conditional underground water rights for two wells accompanied by a plan for augmentation to replace surface water depletions occasioned by the pumping of the two wells. The owners of certain small capacity domestic water wells as defined in section 37–92–602, 15 C.R.S. (1990 & 1996 Supp.) (hereinafter 602 wells or exempt wells), in the vicinity

filed statements of opposition asserting that the proposed Turkey Cañon wells would diminish the water supply available for their wells.[1] The water court held that the owners of unadjudicated exempt wells were not entitled to argue that their water rights would be injured by the Turkey Cañon wells, because the exempt wells did not constitute vested water rights within the meaning of section 37–92–305(3), 15 C.R.S. (1990). The water court ultimately granted Turkey Cañon's application for conditional water rights and approved its plan for augmentation. Certain objectors [2] (objectors) now appeal.[3]

■ We view the unbroken precedent of our cases to hold that water rights vest upon appropriation, not upon adjudication. Adjudication of water rights does not vest those rights, but rather establishes a priority date that can be enforced against other users. Owners of exempt wells *may* apply for adjudication of their 602 wells through the water courts, but they need not. *See* § 37–92–602(4), 15 C.R.S. (1990). If the owner of an exempt well does apply for such an adjudication, the original priority date of the well is to be awarded regardless of the date of application. *See id.*

■ We now confirm that an exempt well owner does have a vested water right; however, the priority of such right is not enforceable until the exempt well owner files an application for adjudication. Once the exempt well owner files, he or she has a statutorily guaranteed expectation of the original priority date of the well. Therefore, the right, which has already vested due to appropriation, becomes legally enforceable upon the filing of an application for adjudication.

■ We conclude that owners of exempt wells may assert injury to their water rights in water court once they have filed for adjudication of those rights. Actual entry of the decree is not a condition precedent, because any uncertainty in the award of a priority date is statutorily resolved. We further hold that in reviewing permit applications for non-exempt wells, the state engineer must take into account injury to all existing wells, exempt or non-exempt; however, in the context

1. One exempt well owner had obtained a water court adjudication; a few of the owners had filed for, but had not yet received adjudication; and the balance of the owners had never sought adjudication.

2. Not all objectors who filed statements of opposition are appellants in this proceeding. The objectors who are appellants in this case are as follows: Ethel Shirola; Matt and Karen Shirola; Larry and Dorothy Lasha; Richard and Pamela Guy; Wendy Drew and David Anderson; Greg and Tami Dickey; Evelyn Ellis; Tony and Tuesday Heslop; Will and Jeanne King; Hans and Hilde Liebrich; Peter Cook and Rhonda Svoboda; Joe and Pat Macaluso; Mike and Linda Landry; Jim and Sydney Dickey; Larry and Karen Adams; and Paul and Edie Darrah.

3. The issues presented for review are as follows:

1. Did the Court err as a matter of law when he ruled that any Objector whose water right is an unadjudicated "602 well", as defined in C.R.S. § 37–92–602(1)(a), (b), (c), (d), (e), does not have a "vested water right" as defined in C.R.S. § 37–92–305(3), and, therefore, does not have standing to assert injury to that water right in the augmentation plan adjudication and adjudication for decree of conditional water rights?

2. Did the Court err in granting water rights for wells TCR No. 1 and TCR No. 2, when there were not findings before him by the State Engineer as to whether the proposed wells would materially injure the vested water rights of Objectors, which findings are required by C.R.S. § 37–90–137(2) and C.R.S. § 37–92–305(6)?

3. Did the Court err in making any findings of fact, conclusions of law, or judgment regarding well-to-well injury?

4. Are the calculations and assumptions regarding the recharge amounts found on page nine of the Decree and the calculations and assumptions regarding the apportionment of depletions between two drainages in paragraph 17 of the Decree clearly erroneous, in discord with each other, and cannot be harmonized?

5. Did the Court err as a matter of law in certain evidentiary rulings which denied Objectors the opportunity to admit evidence, testimony and exhibits at trial?

6. Did the Court err as a matter of law when he ruled that for "purposes of evaluating the impacts of the applicant's proposed water augmentation plan, 'injury' shall be defined as a 'material, substantial or unreasonable' detrimental effect upon a vested water right"?

7. Did the Court err as a matter of law when he ruled that certain Objectors who filed applications to adjudicate their "602 wells" did not have standing to assert injury to that water right in the augmentation plan adjudication?

of this augmentation proceeding, findings by the state engineer are not a condition precedent to a water court ruling. Because the objectors were not permitted to assert injury to their exempt wells, we reverse in part and remand for further proceedings consistent with this opinion.

## I.

Turkey Cañon applied for the approval of conditional underground water[4] rights along with a plan for augmentation.

The underground water rights relate to two wells[5] that Turkey Cañon intends to drill into the fractured Manitou Limestone Formation (Manitou). The Manitou is a water bearing, sedimentary formation underlying portions of Turkey Cañon's property, steeply to gently dipping to the east across the property and overlaid in most areas by the Fountain Formation (Fountain). The Manitou consists of fractured limestone that is approximately 50 to 100 feet thick. Due to fractures, the Manitou is recharged by precipitation falling on the Pikes Peak Granitic Complex (Granitic Complex). The Granitic Complex, which is an outcropping of fractured igneous rock on the surface to the west of the Turkey Cañon property, is hydrologically connected to the Manitou. Either one, or if necessary, both wells, will supply water for a central water system to serve all subdivision lots.

While both wells are physically located within the Red Creek drainage, the impact of the pumping of water from the wells will deplete surface water from both the Turkey Creek drainage and the Red Creek drainage by intercepting water that would otherwise go into the streams. Both drainages are tributary to the Arkansas River. Turkey Creek, Red Creek, and the Arkansas River system are all overappropriated. Certain portions of the Turkey Cañon property lie in the Red Creek drainage, and the remainder of the property is located in the Turkey Creek drainage. The residents of each subdivision lot will use water from the central system, and the return flow will go back to the respective stream systems through individual septic tank leach field systems.

The plan for augmentation is intended to replace depletions to both drainages caused by the use of the two wells. Under Turkey Cañon's plan for augmentation, Turkey Cañon will replace depletions to Turkey Creek with water from the subdivision septic system return flow and from additional pumping from the wells with discharge directly into Turkey Creek.

The depletions to the Red Creek drainage and the Arkansas River will be replaced by the direct augmentation of the Arkansas River. Turkey Cañon's use of water within the Red Creek drainage will deplete certain portions of Red Creek. However, Turkey Cañon will not directly augment Red Creek because the water court found that there are no surface water rights diverting on the affected stream reaches of Red Creek. The augmentation to the Arkansas River, where the injury will occur, will be accomplished through the dedication of surface water rights embodied in three or more shares of Twin Lakes Reservoir and Canal Company stock owned by Turkey Cañon. A portion of each share of stock is available for augmentation within the Arkansas River Basin. Additionally, Turkey Cañon will curtail its diversions, limit the subdivision's occupancy, or provide additional augmentation water to the extent the division engineer deems necessary to avoid injury to senior water users.

Subsequent to filing its application with the water court, in July 1995, Turkey Cañon

---

4. Underground water is "water in the unconsolidated alluvial aquifer of sand, gravel, and other sedimentary materials and all other waters hydraulically connected thereto which can influence the rate or direction of movement of the water in that alluvial aquifer or natural stream. Such 'underground water' is considered different from 'designated ground water' as defined in section 37-90-103(6)." § 37-92-103(11), 15 C.R.S. (1990).

An aquifer is "a formation, group of formations, or part of a formation containing sufficient saturated permeable material that could yield a sufficient quantity of water that may be extracted and applied to a beneficial use." § 37-90-103(2), 15 C.R.S. (1990).

5. A well means "any structure or device used for the purpose or with the effect of obtaining ground water for beneficial use from an aquifer." § 37-92-103(14)(a), 15 C.R.S. (1996 Supp.).

filed applications for non-exempt well permits pursuant to section 37–90–137, 15 C.R.S. (1990 & 1996 Supp.), with the state engineer. At that time, Turkey Cañon had already drilled one well as a monitoring and observation hole. However, the second well had not yet been drilled as of the time of filing for a well permit; Turkey Cañon had only surveyed the site for the second well. In August 1995, the state engineer denied both applications, finding in each application, in pertinent part, that:

8. Turkey Creek, Red Creek, and the Arkansas River System are overappropriated. At some or all times of the year, the water supplies for said stream systems are insufficient to satisfy all of the decreed water rights senior to an appropriation by the applicant.

9. The proposed diversion from the subject well would cause depletion to Turkey Creek, Red Creek, and the Arkansas River System at times when those streams are overappropriated.

. . . .

11. A proposed augmentation plan has been submitted to the Division 2 Water Court (Case No. 94CW06), however, the plan has not been approved by the Division 2 Water Court.

Based on the above, the State Engineer is unable to find that unappropriated water is available for withdrawal by the proposed well[s] and that the vested water rights of other appropriators will not be materially injured. The application[s] are therefore denied.

Various parties, including the state engineer, the division engineer, and a group of forty landowners who own and use exempt wells, objected to the Turkey Cañon water application.[6] On September 8, 1995, pursuant to a motion in limine filed by Turkey Cañon, the water court ruled that the owners of unadjudicated exempt wells lacked standing under section 37–92–305(3), 15 C.R.S. (1990), to assert injury to their water rights occasioned by the Turkey Cañon application, because their rights were not vested.

After the September 8 order, certain individual objectors who had been denied standing because their wells were not adjudicated requested that they be given "vested water right" status because they had *filed* applications for adjudication. Some of those objectors had filed prior to the September 8 order, and others filed after the order. However, none of those objectors had received a decree. In an order on October 27, 1995, the water court denied this request as well.

The trial on Turkey Cañon's water application commenced on November 27, 1995. Robert and Linda Stack, the holders of an adjudicated exempt well water right, were the only remaining exempt well objectors who had been given standing to assert injury.[7] Both sides presented evidence regarding the Manitou, the Fountain, the Granitic Complex, pressure readings, the flow of water and the faults within the formations, recharge, the interaction between the formations, the water-bearing characteristics of each formation, and the geologic history of the entire area.

At the conclusion of the five day trial, the water court entered a decree approving Turkey Cañon's application for conditional underground water rights and plan for augmentation.

## II.

The water court denied the objectors standing to assert injury to their exempt wells on the grounds that they were not holders of vested water rights under section 37–92–305(3), 15 C.R.S. (1990), which provides that a "plan for augmentation, including water exchange project, shall be approved if such change or plan will not injuriously affect the owner of or persons en-

---

6. The United States of America, the Twin Lakes Reservoir and Canal Company, the City of Colorado Springs, and Harold C. Ingersoll also objected. However, those four objectors entered into stipulations with Turkey Cañon, which are incorporated by reference into the decree and which are not at issue here.

7. The state engineer and the division engineer were present at trial, but they did not actively participate. Upon review of Turkey Cañon's decree, both consented to its entry.

titled to use water under a vested water right or a decreed conditional water right." § 37–92–305(3). In short, the water court held that for the objectors to have standing to assert injury, they were required to have an adjudicated water right. The court thereby equated "vesting" under the statute with adjudication.

### A.

■ In order to establish a framework of analysis, we look first to our traditional definition of standing in other contexts. *See Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977) (setting forth Colorado's general standing criteria). The conventional inquiry on standing is whether the plaintiff has suffered injury in fact to a legally protected interest as contemplated by statutory or constitutional provisions. *See id.* An injury in fact that confers standing "may exist solely by virtue of 'statutes creating legal rights the invasion of which creates standing.'" *Cloverleaf Kennel Club, Inc. v. Colorado Racing Comm'n*, 620 P.2d 1051, 1057 (Colo.1980) (quoting *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)).

■ The Water Right Determination and Administration Act of 1969 (the Act), §§ 37–92–101 to –602, 15 C.R.S. (1990 & 1996 Supp.), creates two levels of adversary involvement in augmentation plan or change of water right proceedings: (1) permission to file a statement of opposition; and (2) standing to assert injury. First, section 37–92–302(1)(b), 15 C.R.S. (1990), allows "any person" to file a statement of opposition and to hold the applicant for water rights to a standard of "strict proof." Ownership of a decreed water right is not a necessary requirement for participation in a water court proceeding. *See FWS Land & Cattle Co. v. State*, 795 P.2d 837, 839 (Colo.1990).

Second, section 37–92–305(3) provides that a water judge must approve a proposed plan for augmentation if such plan "will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right." § 37–92–305(3); *see also* § 37–92–305(8), 15 C.R.S. (1996 Supp.) (water judge or referee must consider injury to vested water right or decreed conditional water right in approving terms and conditions necessary to avoid injury and in reviewing proposed plan for augmentation).

■ Therefore, in a water adjudication involving a proposed plan for augmentation or a change of water right, any person may object to the application itself and participate in the adjudication by holding the applicant to a standard of strict proof. However, for that objector to have standing to assert injury to his or her water right, the objector must show that he or she has a *legally protected interest* in a *vested water right* or a conditional decree.[8]

### B.

■ We must initially determine whether the objectors have vested water rights in their 602 wells. We conclude that they do.

■ The Act defines a water right as "a right to use in accordance with its priority a certain portion of the waters of the state by reason of the appropriation of the same." § 37–92–103(12), 15 C.R.S. (1990). The waters of natural streams subject to appropriation[9] include not only the surface flows but all tributary underground water. *See Three Bells Ranch Assocs. v. Cache La Poudre Water Users Ass'n*, 758 P.2d 164, 169 (Colo. 1988).

■ Under the Colorado Constitution, the water of every natural stream within the

---

**8.** We do not intend our holding today to overrule or detract from this court's holding in *Wadsworth v. Kuiper*, 193 Colo. 95, 562 P.2d 1114 (1977), in which we recognized the broad standing afforded to the state and division engineers under the Act to allow them to fulfill their statutory duties.

**9.** An appropriation is the "application of a specified portion of the waters of the state to a benefi-

cial use pursuant to the procedures prescribed by law ...." § 37–92–103(3)(a), 15 C.R.S. (1990). Beneficial use means "the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made ...." § 37–92–103(4), 15 C.R.S. (1990).

state is the property of the public, and is dedicated to the use of the people subject to appropriation. *See* Colo. Const. art. XVI, § 5. Thus, a water right is usufructuary in nature because it gives its holder the right to use and enjoy the property of another. *See Navajo Dev. Co. v. Sanderson,* 655 P.2d 1374, 1377 n. 2 (Colo.1982).

■ A water right is created when a person appropriates or initiates an appropriation of unappropriated water of a natural stream of the state. *See Purgatoire River Water Conservancy Dist. v. Witte,* 859 P.2d 825, 835 (Colo.1993); *Cresson Consol. Gold Mining & Milling Co. v. Whitten,* 139 Colo. 273, 283, 338 P.2d 278, 283 (1959). The right to the use of water accrues by virtue of acts in putting the water to a beneficial use.[10] *See Dallas Creek Water Co. v. Huey,* 933 P.2d 27, 34 (Colo.1997); *Cresson,* 139 Colo. at 284, 338 P.2d at 283. Thus, once an appropriation is completed with reasonable diligence through the application of water to beneficial use, the appropriator's water right vests. *See* § 37–92–103(6), 15 C.R.S. (1990) (definition of conditional water right); *Purgatoire River,* 859 P.2d at 832, 835 (conditional water right matures into water right upon diligent completion of appropriation); *Armstrong v. Larimer County Ditch Co.,* 1 Colo. App. 49, 59, 27 P. 235, 237 (1891) (right to use water is perfected upon completion of appropriation, and thereby becomes vested as of date of legal appropriation).

■ Water rights that are established by an appropriation combined with an intent to appropriate are property rights. *See Three Bells Ranch,* 758 P.2d at 169. Due to its usufructuary nature, the property right is the right to use the water. *See Armstrong,* 1 Colo.App. at 59, 27 P. at 237.

A water rights adjudication is a proceeding to ascertain the respective priorities of water rights on a stream system, including tributary ground water rights. *See* § 37–92–203, 15 C.R.S. (1990) (adjudication is a judicial function); § 37–92–301(3)(c), 15 C.R.S. (1990) (wells that involve tributary ground water

are regulated within the priority system under the Act); *see generally* A. Dan Tarlock, *Law of Water Rights and Resources* § 7.02 (Release # 8, 7/96) (describing the general nature and function of adjudication).

Any water right holder may file an application with the appropriate water court to have his or her water right adjudicated. *See* § 37–92–302(1)(a), 15 C.R.S. (1990). The water clerk shall prepare a resume of the application and publish such resume on a monthly basis in the local media. *See* § 37–92–302(3), 15 C.R.S. (1990). Any person may oppose the application by filing a timely statement of opposition. *See* § 37–92–302(1)(b), 15 C.R.S. (1990).

■ A decree does not confer, but rather confirms a pre-existing water right, or in the case of conditional applications, gives the applicant the opportunity to develop the right and obtain a priority date that relates back to the date of the first appropriation. *See* §§ 37–92–305(1), –306, 15 C.R.S. (1990); *Simpson v. Highland Irrigation Co.,* 917 P.2d 1242, 1252 (Colo.), *cert. denied,* —— U.S. ——, 117 S.Ct. 480, 136 L.Ed.2d 375 (1996); *see also Purgatoire River,* 859 P.2d at 835 (water decree is simply a determination that a right has been established); *United States v. Bell,* 724 P.2d 631, 642 (Colo.1986) ("Water rights are obtained by a combination of acts and intent constituting appropriation and are not dependent upon adjudication."); *Cresson,* 139 Colo. at 283–84, 338 P.2d at 283 (an adjudication only confirms that which has already been accomplished); *Black v. Taylor,* 128 Colo. 449, 458, 264 P.2d 502, 506–07 (1953) (decrees are matters of evidence of rights previously acquired, and are not the substance of the appropriation).

## C.

We turn now to the next question required in an analysis of standing: whether the vested water rights held by the objectors are legally enforceable.

In order to provide state officials with a means by which to administer competing wa-

---

**10.** The right to use water may also accrue by virtue of the production and development of nontributary ground water. *See Cresson Consol.* *Gold Mining & Milling Co. v. Whitten,* 139 Colo. 273, 284, 338 P.2d 278, 283 (1959).

ter rights, the General Assembly adopted the Act. *See State Eng'r v. Castle Meadows, Inc.,* 856 P.2d 496, 505 (Colo.1993) (in adopting the Act, General Assembly recognized need to protect those who hold vested water rights); *South Adams County Water & Sanitation Dist. v. Broe Land Co.,* 812 P.2d 1161, 1163 (Colo.1991) (General Assembly established system for settling conflicting priorities to water rights through a process of adjudication and decree). The Act provides for the adjudication and administration of tributary water under a system of priorities, which provides a mechanism for enforcement of the prior appropriation doctrine.

■■■■ Absent an adjudication under the Act, water rights are generally incapable of being enforced. *See Highland,* 917 P.2d at 1252–53 (security for water rights largely depends on state engineer's diversion curtailment enforcement power); *Cresson,* 139 Colo. at 283, 338 P.2d at 283 (between parties whose water rights have never been adjudicated, neither can claim an advantage over the other by reason of absence of decreed priorities). Once a water right has been adjudicated, it receives a legally vested priority date that entitles the owner to a certain amount of water subject only to the rights of senior appropriators and the amount of water available for appropriation. *See* § 37–92–306, 15 C.R.S. (1990); *Navajo Dev.,* 655 P.2d at 1377. The holder of an adjudicated right is entitled to the use of a certain amount of water unless called out by senior users or unless the stream itself contains insufficient flow. *See* §§ 37–92–301(2), –302(1)(a), 15 C.R.S. (1990); *Navajo Dev.,* 655 P.2d at 1377.

■■■ The statutorily prescribed duties of state water officials require them to administer the waters of the state in accordance with decreed priorities. *See* §§ 37–92–301(3), –501, –503, 15 C.R.S. (1990 & 1996 Supp.); *see also Highland,* 917 P.2d at 1252–53. Without a judicially decreed priority date, a water right owner has no right to request the division engineer to call out junior users in order to satisfy its own use.

■■■ The priority dates afforded to water rights· establish their relative seniority for purposes of administration within the system.

Those dates are established by operation of statute. Specifically, section 37–92–306 provides that all water rights adjudicated in a previous decree are senior to water rights adjudicated in a subsequent decree on the same stream, regardless of their dates of appropriation. *See* § 37–92–306; *see also South Adams County,* 812 P.2d at 1163–64; *Huerfano Valley Ditch & Reservoir Co. v. Hinderlider,* 81 Colo. 468, 473–74, 256 P. 305, 307 (1927). The date of appropriation awarded for rights decreed in any particular year establishes the relative priority among other rights awarded on applications filed in the same calendar year. *See* § 37–92–306; *City & County of Denver v. City of Englewood,* 826 P.2d 1266, 1276 (Colo.1992); *United States v. Bell,* 724 P.2d 631, 641–42 (Colo. 1986).

■■■ Thus, pursuant to the postponement doctrine, the actual date of appropriation of water does not usually serve to establish any priority except as among applications filed in the same calendar year. The priority of the decree is much more dependent upon the date of the decree than upon the date of appropriation. The actual award of a decree, or formal adjudication of the water right, is therefore generally a condition precedent to any effort to enforce that right by calling out a junior user. Otherwise, there would be no way for the state or division engineers to know which user was actually junior. Generally then, a vested water right is not legally enforceable through the water administration system unless it is represented by a water court decree, obtained after full adjudication.

As a general proposition, then, although a water right vests upon appropriation, it is not legally enforceable until it is adjudicated. Were that the end of the inquiry, the water court's decision to prevent the objectors from asserting injury to unadjudicated water rights would have been correct. However, in the case of exempt wells, it is *not* the end of the inquiry.

### D.

■■■ In an effort to protect small agricultural or domestic well water users, the Gen-

eral Assembly has created a statutory category for exempt wells that differs from all other water rights. *See* § 37–92–602, 15 C.R.S. (1990 & 1996 Supp.). By that statutory exception, the General Assembly has awarded the expectancy of a certain priority date, unaffected by the year in which the exempt well owner files for adjudication. Thus, vested water rights in exempt wells are not subject to the postponement doctrine set forth in section 37–92–306. Because of the statutory provisions regarding exempt wells, we conclude that an exempt well owner may attain a legally protected interest in his or her vested water right merely by filing an application for adjudication of such well.[11]

The separate statutory framework applies to small domestic or agricultural ground water wells [12] not exceeding fifteen gallons of water per minute of production in order to allow citizens in less densely populated areas to obtain a water supply for in-house and domestic animal uses where other water supplies are not available. *See* §§ 37–92–602(1), (6), 15 C.R.S. (1990 & 1996 Supp.).

An individual intending to drill an exempt well must obtain a permit from the state engineer. *See* § 37–92–602(3)(a), 15 C.R.S. (1990). Contrary to procedures applicable to non-exempt wells,[13] the state engineer is entitled to presume that the use contemplated by the exempt well will not materially injure the vested water rights of others. *See* § 37–92–602(3)(b)(II)(A), 15 C.R.S. (1996 Supp.).[14] Once the permit is issued, the owner must drill the well within two years, unless the owner shows good cause to the state engineer for not drilling the well within that period. *See* § 37–92–602(3)(d), 15 C.R.S. (1990).

The owner of an exempt well need not satisfy various requirements imposed upon

**11.** In their opening brief, the objectors note the existence of at least 155,912 exempt wells permitted or late registered in Colorado. If we were to hold that an exempt well owner does not have standing to assert injury in an augmentation plan proceeding until the 602 well is adjudicated, exempt well owners would flood the water courts with applications for adjudication of their wells to protect their water rights. Exempt well owners would have to file for adjudication immediately to ensure their receipt of an adjudicated decree before the filing of any proposed plan for augmentation.

Rather, the effect of our current holding that exempt well owners have standing to assert injury upon the filing of an application for adjudication is to maintain the exempt status the General Assembly afforded 602 wells until such time as the exempt well's water supply is jeopardized by a proposed plan for augmentation. Such a circumstance may never occur because 602 wells are often located in very remote areas. If it does occur, the exempt well owner may then file for adjudication and assert injury to his or her water right.

**12.** Section 37–92–602(1), 15 C.R.S. (1990 & 1996 Supp.), identifies the exemption criteria for small capacity domestic and agricultural wells. First, the wells may not exceed a pumping rate of fifteen gallons per minute of production, *see* sections 37–92–602(1)(b)–(c), unless such wells are used exclusively for fire-fighting purposes, *see* section 37–92–602(1)(d); the wells were in production prior to May 22, 1971, in which case the pumping rate is not to exceed fifty gallons per minute, *see* section 37–92–602(1)(e); or the wells are used exclusively for monitoring and observation purposes, *see* section 37–92–602(1)(f).

The General Assembly also limited the purposes for which such exempt wells may be used. Small capacity wells fall within the exempt provisions of section 37–92–602(1) in pertinent part if they are used strictly for the following purposes: "ordinary household purposes, fire protection, the watering of poultry, domestic animals, and livestock on farms and ranches and for the irrigation of not over one acre of home gardens and lawns but not used for more than three single-family dwellings ...." § 37–92–602(1)(b); *see also* § 37–92–602(1)(e).

**13.** The state engineer must determine whether the use of the well will materially injure the vested water rights of others when dealing with non-exempt wells. *See* § 37–90–137(2)(a), 15 C.R.S. (1996 Supp.).

**14.** Section 37–92–602(3)(b)(II)(A) states in pertinent part:

If a permit is sought by a user for a well exempted under paragraph (b) of subsection (1) of this section which will be the only well on a residential site, which well will be used solely for ordinary household purposes inside a single-family dwelling and will not be used for irrigation ... and the return flow from such uses shall be returned to the same stream system in which the well is located, *there shall be a presumption that there will not be material injury to the vested water rights of others or to any other existing well resulting from such well,* which presumption may be rebutted by evidence sufficient to show material injury. (Emphasis added.)

non-exempt wells by the state engineer. More importantly here, the owner of a 602 well need not apply for adjudication of the well through water court. *See* § 37–92–602(4), 15 C.R.S. (1990). However, the owner *may* seek such an adjudication in order to fix a priority date for the well. *See id.* As this court stated in *Davis v. Conour,* 178 Colo. 376, 380, 497 P.2d 1015, 1017 (1972), "While the wells are small, they are usually of great importance to their owners. The only true and correct way for a person to have a record of his priority date, if he so desires, is to have that date decreed by a court of competent jurisdiction."

 The statute not only allows exempt well owners to obtain adjudication if they wish, but it also creates a unique priority system whereby "the original priority date of any such well may be awarded regardless of the date of application therefor." § 37–92–602(4). The 602 wells are therefore not subject to the postponement doctrine set forth in section 37–92–306, 15 C.R.S. (1990), and explained in *United States v. Bell,* 724 P.2d 631, 641–42 (Colo.1986). Rather, upon adjudication, 602 wells will receive as a priority date the date of their well permit, without reference to the date of the application for the adjudication. *See* § 37–92–602(4).

By enacting this provision, the General Assembly provided a benefit to exempt well owners. Other applicants before the water court are subject to the postponement doctrine set forth in section 37–92–306. Under that section, the date of appropriation is used as a priority date only to determine the relative sequence of priorities among water rights decreed in the same calendar year. *See* § 37–92–306; *City & County of Denver v. City of Englewood,* 826 P.2d 1266, 1276 (Colo.1992). As between water rights decreed in different years, decrees are prioritized by year of award. *See* § 37–92–306; *United States v. Bell,* 724 P.2d at 642.

 Unlike other applicants before the water court, due to the operation of section 37–92–602(4), once an exempt well owner applies for adjudication, that owner is assured a priority date coincident with the appropriation of water, irrespective of the year in which the owner applies. At the point the exempt well owner files, the right becomes capable of administration and enforcement within the priority system under the Act.[15]

The General Assembly created this exception for agricultural and domestic well water users based upon the assumption that their use is of such a minimal nature that it need not be mandatorily subsumed within the administration system. *See* § 37–92–602(3)(b)(II)(A), 15 C.R.S. (1996 Supp.) (presumption that use of an exempt well will not cause material injury to vested water rights of others). Those users are not required to expend the time and money necessary to adjudicate their rights; however, if, because of impending uses that would cause injury or for other reasons, they do wish to pursue adjudication, their priority date always relates back to the original appropriation. The small capacity domestic well users thus have the benefit of protection from the administration system when they need it.

 We conclude, therefore, that when an exempt well owner files for adjudication, he or she obtains a legally enforceable vested water right capable of administration, because the priority date is readily ascertainable and fixed pursuant to statute. That exempt well owner is then entitled to assert injury in an augmentation plan proceeding.

We have previously reached a similar conclusion in a different context. In *Rocky Mountain Power Co. v. White River Electric Ass'n,* 151 Colo. 45, 376 P.2d 158 (1962), this court determined that a holder of a conditional water right had a vested right which permitted him to assert injury in a change of water right proceeding. *See id.* at 53, 376 P.2d at 162; *see also Simpson v. Highland Irrigation Co.,* 893 P.2d 122, 128 (Colo.1995) (stake in the administration of one's own water rights is a legally protected right or interest). In *White River,* we held that a

---

15. We presume that exempt well owners who file for adjudication pursuant to section 37–92–602(4) will follow through in having their wells adjudicated, and will not withdraw their applications prior to receiving a decree once a water court takes their rights into account in an augmentation plan proceeding.

claimant for a conditional water right had standing to assert injury to protect the priority date the claimant would receive if he ultimately put the water to beneficial use and received a decree for an absolute right.[16] Thus, we recognized that the claimant had a stake in the priority he would eventually receive if he diligently proceeded to apply the water to a beneficial use. "[O]ne who is entitled to a conditional decree defining his rights to water for future application to use has a vested right which he may protect in case of any action by others to destroy or injure that right." 151 Colo. at 53, 376 P.2d at 162.

The same reasoning applies in this case. Just as a conditional right holder is entitled to protect a priority and proposed use absent an absolute decree, so too an exempt well owner should be entitled to protect a priority and an actual use without the need for an absolute decree. The exempt well owner's stake is the antedated priority guaranteed by statute, and the exempt well owner may protect that interest against injury by one who proposes a plan for augmentation. Hence, we reverse the water court's conclusion to the contrary.

## III.

■ Our holding that the exempt wells are vested water rights for purposes of section 37–92–305(3) necessarily means that the exempt wells are vested water rights for purposes of section 37–90–137, 15 C.R.S. (1990 & 1996 Supp.), governing the state engineer's permit application review process for non-exempt wells.

Under that statute, upon receipt of a permit application for a non-exempt well, the state engineer must determine whether use of the well will cause material injury to the vested water rights of others. See § 37–90–137(2)(a), 15 C.R.S. (1996 Supp.). Before issuing the permit, the state engineer must make four findings: (1) unappropriated wa-

ter is available; (2) the vested water rights of others will not be materially injured; (3) hydrological and geological facts substantiate the proposed well; and (4) the proposed well will be located at a distance greater than 600 feet from any other existing wells. See § 37–90–137(2)(b)(I), 15 C.R.S. (1996 Supp.).

There are two exceptions to the 600 foot limitation. First, the state engineer may issue a non-exempt well permit if, after a hearing, the state engineer finds that "the circumstances in a particular instance so warrant." Id. The second exception arises if the proposed well is part of a water court proceeding adjudicating the water right for the well, or if the well is part of an adjudication of a plan for augmentation or a change of water right. See § 37–90–137(2)(b)(II)(B), 15 C.R.S. (1996 Supp.). Under the second exception, the state engineer is not required to hold a hearing if the applicant for the proposed well gave notice to the record owners of all wells within 600 feet of the proposed well. See id. If the water court enters a decree for the proposed well location after proper notice has been provided to other well owners, the state engineer may issue a well permit without regard to the 600 foot limitation. See § 37–90–137(2)(b)(I).

■ We read the statute to require the state engineer to take into account all vested water rights of which he has notice, whether or not adjudicated, in determining the impact of a proposed non-exempt well. The General Assembly provided that exempt wells are entitled to a presumption that they do not materially injure the rights of others; the General Assembly did not provide that exempt wells are burdened by an inverse presumption that no other use materially injures them.

The objectors assert that the water court erred in proceeding to consider Turkey Cañon's application in the absence of specific findings from the state engineer as to whether the proposed wells would materially injure

---

**16.** This case preceded the enactment of section 37–92–305(3), 15 C.R.S. (1990). In *White River*, we interpreted the term "vested rights" within the meaning of 1953 C.R.S. §§ 147–9–22, –25, which were similar to section 37–92–305(3). The early sections, which have been repealed, required the water court to take into account injury to the "vested rights of others," while the current version requires a consideration of injury to both "vested water right[s] and decreed conditional water right[s]." *See* § 37–92–305(3).

the objectors' vested water rights. Although we have concluded that exempt wells are vested water rights that must be considered by the state engineer in reviewing permit applications for non-exempt wells, we nonetheless reject the objectors' argument.

■ The state engineer's findings in denying Turkey Cañon's permit applications were sufficient. The state engineer is not required by any statutory provision to make specific well-to-well findings as to the existence of injury. The state engineer found injury, and deferred to the pending augmentation proceeding in which the water court was called upon to determine whether that injury would be abated by augmentation water. Particularly in a circumstance in which the state engineer deniés a permit application and recognizes the pendency of an augmentation proceeding designed to address that injury, he is under no obligation to devote the resources that would be necessary to determine well-to-well injury to any potentially affected well. The state engineer's findings of material injury operate in the water court as a presumption, and the applicant bears the burden of overcoming the presumption. *See Danielson v. Jones,* 698 P.2d 240, 248–49 (Colo.1985). Hence, the state engineer's findings were sufficient and the water court was entitled to proceed to hear the application for approval of a plan for augmentation.

### IV.

### A.

We turn now to the balance of the objectors' assertions of error. First, the objectors argue that the water court's error in denying them standing to assert injury entitles them to a complete new trial. Turkey Cañon counters that it was held to strict proof; that the water court found the augmentation plan would abate injury to all vested water rights; and that both the legal conclusion and the factual findings supporting that conclusion

should be unaffected by a determination that the objectors have standing to assert injury to their own wells.

■ General principles of law dictate that an individual cannot be bound by the outcome of a proceeding to which he or she was not a party. *See S.O.V. v. People in Interest of M.C.,* 914 P.2d 355, 359 (Colo. 1996). Due process requires a full and fair opportunity to litigate issues, even when those issues may have previously been decided contrary to the non-party's interest. *See id.*

■ Even if the objectors were permitted to participate in the proceeding to the extent of holding Turkey Cañon to strict proof, they were not permitted to assert injury to their wells. Therefore, the water court findings relative to non-injury to vested water rights cannot bind the objectors.

■ On the other hand, a complete new trial is not warranted. Certain of the water court findings were unrelated to the objectors' assertions. For example, the amount of water that Turkey Cañon will pump from the wells and use in its subdivision is not contested; the basic geological and hydrological findings are not at issue with the exception of whether there is any connection between the Fountain and the Manitou formations; and the apportionment of recharge and depletion between the Turkey Creek and the Red Creek drainages may or may not be at issue depending upon whether the objectors can show that those figures impact their wells. The water court apportioned the depletions between the two drainages and ordered augmentation to the surface water systems accordingly.[17]

The important issue is that no augmentation water will be added to the Manitou formation itself. The objectors maintain, contrary to the findings of the water court, that the Manitou and the Fountain are hydrologically connected. Hence, the objectors

---

**17.** In assessing depletions to be caused by the proposed wells, the water court adopted Turkey Cañon's engineering assumption that the depletion assigned to the Turkey Creek and the Red Creek drainages from each well is proportional to the portion of recharge area from each drainage within a cylinder centered on each well. Such a finding is supported by substantial evidence in the record. Subject to the provisions of this opinion permitting the objectors to reopen the water court's findings, such findings will not be disturbed on appeal.

argue that the pumping of the Turkey Cañon wells will cause the static water level of the Manitou aquifer to be lowered, thus injuring those objectors whose wells are fed either by the Manitou or by the Fountain.[18] This is the principal issue which the water court should address upon remand by permitting the objectors to reopen such aspects of the proceeding as to which they can present a prima facie showing of injury.[19]

## B.

■ The objectors lastly[20] contest the water court's definition of injury as a "material, substantial or unreasonable" detrimental effect upon a vested water right, arguing that injury in the context of tributary ground water wells must be governed by *City of Colorado Springs v. Bender*, 148 Colo. 458, 366 P.2d 552 (1961).

■ The statute in question provides that a plan for augmentation shall be approved by the water court if it "will not injuriously affect the owner of or persons entitled to use water under a vested water right...." § 37–92–305(3), 15 C.R.S. (1990). The Colorado Ground Water Management Act, §§ 37–90–101 to –143, 15 C.R.S. (1990 & 1996 Supp.), directs the state engineer, upon receipt of a permit application for a non-exempt well outside the boundaries of a designated basin, to determine "whether or not the exercise of the requested permit will

materially injure the vested water rights of others." § 37–90–137(2)(a), 15 C.R.S. (1996 Supp.). When the state engineer has made a finding of material injury to senior water rights, the applicant for an adjudicated water right bears the burden of proving to the water court that the water right sought will not cause such material injury. *See Danielson v. Jones*, 698 P.2d 240, 249 (Colo.1985).

*Bender* was an action brought by a senior appropriator of water from an underground aquifer seeking to enjoin a junior appropriator from withdrawing water from the aquifer. We held that "a junior appropriator may not divert the water to which he is entitled by any method or means the result of which will be to diminish or interfere with the right of a senior appropriator to full use of his appropriation." *Bender*, 148 Colo. at 463–64, 366 P.2d at 556. We also recognized, however, that the senior appropriator has a duty to establish some reasonable means of effectuating his diversion. *See id.* at 462, 366 P.2d at 555. Consistent with encouraging maximum beneficial use of the waters of the state, the senior appropriator is not entitled to command the whole or a substantial flow of the underground aquifer merely to facilitate his taking the fraction of the flow to which he is entitled. *See id.* at 465, 366 P.2d at 556. The cost to the senior of reaching a lowered water table can be assigned to the junior. *See id.* at 464, 366 P.2d at 556.

---

18. The affidavit of Robert A. Longenbaugh, the objectors' engineer, was submitted prior to trial as an offer of proof on the issue of injury to the objectors' wells. The affidavit contests the water court findings on a number of specific issues. Longenbaugh asserts that: (1) the Fountain formation is "hydraulically connected to the Manitou"; (2) recharge to the Manitou from septic system return flows and from a lower piezometric surface that may induce recharge will not be sufficient to maintain the static water level of the Manitou aquifer; (3) the static level of the water will be lowered as a result of the pumping of Turkey Cañon's wells; and (4) the objectors' wells will be injured because the declines at their wells will reduce the flow rate of water entering the wells and will reduce the amount of water stored in each well bore.

19. We create this permissive standard because certain objectors filed timely statements of opposition in this pending proceeding, but had no notice of the requirement to file an application to

adjudicate their well. Those objectors, and others in pending proceedings, should be permitted a reasonable period of time within which to file for adjudication pursuant to section 37–92–602(4). Pending any rule-making that may result from this opinion, we direct that in new proceedings, exempt well owners must file for adjudication on or before the date on which they file a statement of opposition in order to assert a legally protected interest in a vested water right.

20. The objectors also argue that the water court's decision to deny the objectors the right to introduce an exhibit that had not been disclosed or listed in pretrial filings was error. We find the denial to be within the sound discretion of the water court. We also note that testimony regarding the substance of the exhibit was introduced so that any prejudice was minimal. However, this holding is subject to our general conclusion that on remand the objectors may offer any evidence on the issue of injury to their wells.

The principle enunciated in *Bender* is consistent with the injury standard to be applied by the state engineer and by the water court. On remand, the water court is to determine whether Turkey Cañon's application for conditional rights, together with a plan for augmentation, will injuriously affect the objectors'[21] exercise of their vested water rights. The water court may consider whether the objectors themselves are exercising their rights efficiently, and whether there are measures that can be taken by Turkey Cañon to prevent injury to the objectors' wells. However, neither section 37–90–137(2) nor section 37–92–305(3) requires proof of a "substantial or unreasonable" injury as defined by the water court. Rather, those sections require proof of a "material injury."

## V.

■ We conclude that the objectors to the Turkey Cañon water rights and plan for augmentation application who filed for adjudication prior to the date of trial had an enforceable priority date for their vested water rights and were thus entitled to assert injury to their vested water rights.

■ Other objectors who filed timely statements of opposition should be allowed a reasonable period of time within which to file applications to adjudicate their exempt wells.

We therefore remand this case to the water court with instructions to consider injury to adjudicated exempt wells or exempt wells as to which an application for adjudication has been timely filed.[22] The water court shall reconsider the Turkey Cañon application for conditional underground water rights and the proposed plan for augmentation in light of any injury to those 602 wells and in accordance with the limitations set forth in this opinion.

VOLLACK, C.J., dissents, and MULLARKEY, J., joins in the dissent.

Chief Justice VOLLACK dissenting:

The majority holds that the owners of certain wells (exempt well owners) as defined by section 37–92–602, 15 C.R.S. (1990 & 1996 Supp.), have standing to object to an augmentation plan filed by Turkey Cañon Ranch Limited Partnership (Turkey Cañon). The majority reasons that, once the exempt well owners file for adjudications of their water rights, they may allege injury to those rights pursuant to section 37–92–305(3), 15 C.R.S. (1990). In my view, the mere filing for an adjudication of water rights does not create a legally enforceable interest sufficient to confer section 37–92–305(3) standing upon the exempt well owners. For this reason, I dissent.

## I.

On February 24, 1994, Turkey Cañon filed an application in the District Court, Water Division 2 (the water court), requesting approval of conditional water rights and a plan for augmentation relating to two wells it intended to drill under its property. Many parties, including the exempt well owners, objected to Turkey Cañon's application. In July 1995, Turkey Cañon filed applications with the state engineer requesting well permits pursuant to section 37–90–137, 15 C.R.S. (1990 & 1996 Supp.). The state engineer denied Turkey Cañon's applications because all of the water sources in the area were overappropriated.

On September 8, 1995, the water court found that all of the exempt well owners, except one who had an adjudicated water right, lacked standing to assert an injury to their water rights pursuant to section 37–92–305(3) because their water rights had not been adjudicated. Several of the exempt well owners filed for adjudications of their

---

**21.** Consistent with this opinion, the objectors whose exempt wells are now decreed, whose applications were timely filed prior to the November 1995 trial, or who file for adjudication within a reasonable period of time as provided by the water court pursuant to this opinion, will be entitled to consideration by the water court.

**22.** The water court included in its decree a procedure for reopening the decree to consider injury to vested water rights. Such procedure contemplates that the petitioning party asserting injury shall bear the initial burden of proving *prima facie* the specific facts of injury. Once proven, the ultimate burden of proof shall be upon Turkey Cañon to prove absence of material injury.

water rights pursuant to section 37–92–602(4), 15 C.R.S. (1990). The exempt well owners then alleged in the Turkey Cañon proceedings that, by filing for the adjudication of their rights, they now had standing to assert injury pursuant to section 37–92–305(3). The water court denied the exempt well owners' requests. After a five-day trial, the water court entered a decree approving Turkey Cañon's augmentation plan and conditional water rights.

## II.

In *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977), this court adopted a test for determining whether a plaintiff seeking judicial resolution of a legal dispute has standing. Under that test, a plaintiff must have "suffered injury in fact to a legally protected interest as contemplated by statutory or constitutional provisions." *Id.* at 168, 570 P.2d at 539; *see also Mesa Verde Co. v. Montezuma County Bd. of Equalization,* 831 P.2d 482, 484 (Colo.1992); *Board of County Comm'rs v. Bowen/Edwards Assocs., Inc.,* 830 P.2d 1045, 1052–53 (Colo.1992); *Board of County Comm'rs v. Denver Bd. of Water Comm'rs,* 718 P.2d 235, 241 (Colo.1986).

Section 37–92–305(3) provides the standard used by the water court in determining whether to approve a plan for augmentation and provides that a

> plan for augmentation ... shall be approved if such change or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right.

By limiting the statute's terms to those "entitled to use water under a vested water right or a decreed conditional water right," section 37–92–305(3) contains its own standing requirement.[1] When read together with *Wimberly,* a person objecting to a plan for augmentation must be threatened with an injury to a vested and legally protected water right

in order to have standing pursuant to section 37–92–305(3).

Section 37–92–602, 15 C.R.S. (1990 & 1996 Supp.), delineates certain classes of wells that are exempt from the normal procedures necessary to establish a water right. Section 37–92–602 provides in relevant part:

> (1) *The provisions of this article ... shall not be applicable to:*
>
> (a) Designated ground water basins ...;
>
> (b) Wells not exceeding fifteen gallons per minute of production and used for ordinary household purposes ...;
>
> (c) Wells not exceeding fifteen gallons per minute of production and used for drinking and sanitary facilities in individual commercial businesses;
>
> (d) Wells to be used exclusively for firefighting purposes ...
>
> (e) Wells not exceeding fifty gallons per minute which are in production as of May 22, 1971, and were and are used for ordinary household purposes ...; [and]
>
> (f) Wells to be used exclusively for monitoring and observation purposes....

§ 37–92–602, 15 C.R.S. (1990 & 1996 Supp.) (emphasis added). Section 37–92–602(1), 15 C.R.S. (1990), specifically exempts these wells from the provisions of the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602, 15 C.R.S. (1990 & 1996 Supp.) (the Act), which manages and administers adjudicated water rights. Because they are exempt from application of section 37–92–305(3) of the Act, exempt well owners may not avail themselves of the statute's protections. *See Cache La Poudre Water Users Ass'n v. Glacier View Meadows,* 191 Colo. 53, 59, 550 P.2d 288, 292 (1976).

An exempt well owner may choose to have his or her water rights adjudicated by the water court, which is obligated to recognize the well's original priority date regardless of when the application is made. § 37–92–602(4).[2] The exempt well owner's decision to

---

1. This standard is more stringent than the liberal "any person" standing requirement that exists for those who oppose new applications for water rights. *See* § 37–92–302(1)(b), 15 C.R.S. (1990); *FWS Land and Cattle Co. v. State of Colorado, Div. of Wildlife,* 795 P.2d 837, 839 (Colo.1990).

2. Section 37–92–602(4) provides as follows:
 Notwithstanding the provisions of the introductory portion of subsection (1) of this section, water rights for wells of the type specified in paragraphs (b) to (e) of said subsection (1) may be determined pursuant to sections 37–92–302 to 37–92–306; except that the original

adjudicate is not mandatory pursuant to section 37–92–602(4): it is permissible. *See Davis v. Conour*, 178 Colo. 376, 382, 497 P.2d 1015, 1018 (1972). Without an adjudication, however, an exempt well owner's water right remains exempt from the provisions of the Act. *See* § 37–92–602(1); *Danielson v. Milne*, 765 P.2d 572, 573 n. 1 (Colo.1988); *Cache La Poudre*, 191 Colo. at 59, 550 P.2d at 292.

Adjudication is not the mechanism by which water rights are vested. *See Purgatoire River Water Conservancy · Dist. v. Witte*, 859 P.2d 825, 835 (Colo.1993). Instead, adjudication of previously exempt wells removes the water right from exempt status and provides judicial recognition that a water right has been established. *Id.* The adjudication also attaches a priority date to the water right, which defines its relation and seniority to other settled and decreed rights, thereby facilitating judicial enforcement. *See SRJ I Venture v. Smith Cattle, Inc.*, 820 P.2d 341, 346 (Colo.1991). Without an adjudication, an exempt well owner's water right is unenforceable in a water court proceeding, which forecloses the exempt well owner from claiming injury done by a proposed augmentation plan. For this reason, an adjudication is critical to establish an exempt well owner's section 37–92–305(3) standing because it serves to recognize that the well owner may suffer an injury to a vested, legally enforceable water right.

The majority holds that the act of filing for an adjudication is sufficient to confer section 37–92–305(3) standing upon an exempt well owner because the priority date of the well is statutorily deemed to relate back to the original appropriation. Furthermore, the majority holds that an exempt well owner may gain section 37–92–305(3) standing by filing for an adjudication *after* the augmentation plan has been submitted for the water court's review. The majority reasons that, once an exempt well owner files for an adjudication, the well owner "has a statutorily guaranteed expectation of the original priority date of the well." Maj. op. at 744.

In my view, an exempt well owner's water right cannot be legally enforced by our system of water rights until it has been adjudicated and given a priority date. *See Board of County Comm'rs v. Upper Gunnison River Water Conservancy Dist.*, 838 P.2d 840, 855 (Colo.1992). The act of filing for an adjudication may provide the well owner with a statutorily guaranteed expectation of a priority date, but it has no legally operative effect in recognizing the water right and assigning that right a priority date. By obtaining the equivalent of adjudicated rights upon filing, the exempt well owners can suddenly, and without any prior involvement in the appropriation system or notice to others holding decreed rights, assert water rights that relate back to their original appropriation. It is my view that the General Assembly did not intend to confer such expansive power on the owners of exempt wells.

Furthermore, there are practical difficulties associated with granting exempt well owners section 37–92–305(3) standing once they file for an adjudication. As we explained in *Davis:*

> When a well has been in existence for five, ten or twenty years, there is seldom much of a problem in establishing its priority date of appropriation. When, however, that well has been in existence for 100 or 200 years, the problem of establishing the priority date of appropriation becomes difficult, if not impossible. While the wells are small, they are usually of great importance to their owners. The only true and correct way for a person to have a record of his priority date, if he so desires, is to have that date decreed by a court of competent jurisdiction.

*Davis*, 178 Colo. at 380, 497 P.2d at 1017. Additionally, the majority's holding will lead to multiple filings whenever exempt well owners feel threatened by a proposed augmentation plan. As a result, water courts will be forced to undertake the burdensome task of discerning each filing's water right and priority date before it can review the augmentation plan. Finally, exempt well owners could withdraw their adjudication fil-

---

priority date of any such well may be awarded regardless of the date of application therefor.

§ 37–92–602(4), 15 C.R.S. (1990).

ings once their rights were taken into account in the augmentation plan proceedings. This would permit exempt well owners to repeatedly enjoy the benefits of the appropriation system as objectors without ever being subject to its requirements. The act of filing for an adjudication could therefore be a sham in many cases.

Contrary to the majority's opinion, *Rocky Mountain Power Co. v. White River Electric Association*, 151 Colo. 45, 376 P.2d 158 (1962), is distinguishable from the present case. In *White River*, this court found that a holder of a conditional water right had standing to assert injury in a change of water right proceeding. *Id.* at 53, 376 P.2d at 162. It is true that neither conditional right holders nor the exempt well owners in this case have received a final decree. However, conditional right holders have participated in a preliminary adjudication of their water right, and have expended resources in the development of that right in order to secure a priority date that has already been adjudicated.[3] For this reason, conditional right holders are committed to receiving a final decree. Conversely, the exempt well owners' rights remain unadjudicated even though they are free to appropriate water for specified statutory uses and the act of filing for an adjudication does nothing to bind them to the adjudication process.

### III.

In my view, the exempt well owners must have their water rights adjudicated before they can allege an injury to those rights pursuant to section 37–92–305(3). By granting the exempt well owners standing when they simply file for an adjudication, the majority decision gives the exempt well owners legally enforceable rights for performing an act that has no legal significance. Furthermore, the majority's holding will lead to abuses in the adjudication system and circumvent the purposes of the Act. For these

reasons, I would affirm the water court's order. Accordingly, I dissent.

I am authorized to say that Justice MULLARKEY joins in this dissent.

---

**3.** In *White River,* a case decided in 1962, the conditional right holder had expended approximately $690,000 developing the conditional right by the time it asserted injury in the change of use proceeding.