Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2019 CO 14**

**Nos. 17SA231 and 17SA303, *Yamasaki Ring v. Dill*—Water Law—Adjudicated Water Rights—Indicia of Enforceability.**

The supreme court considers whether a 1909 water decree adjudicates a water right in certain springs. Because the decree fails to set forth required indicia of enforceability—including an appropriation date, a priority number, and quantification information—with respect to the springs, the court answers the question in the negative. A decree must measure, limit, and define both the nature and extent of a water right. The priority, the location of diversion at the supply's source, and the amount of water for application to a beneficial use are all essential elements of the appropriative water right. Of these, priority is the most important stick in the water rights bundle because priority is a function of appropriation and adjudication; indeed, the purpose of adjudication is to fix the priority of a water right.

As the water court concluded, the 1909 decree clearly and unambiguously sets forth an unenforceable entitlement to receive and conduct water from the springs. Without indicia of enforceability, and in particular a priority number, the 1909 decree

cannot be deemed to adjudicate a water right in the springs that can be enforced and

administered.  Therefore, the supreme court affirms the water court's judgment.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2019 CO 14**

**Supreme Court Case No. 17SA231**
*Appeal from the District Court*
Pueblo County District Court, Water Division 2, Case No. 13CW3041
Honorable Larry C. Schwartz, Water Judge

Concerning the Application for Water Rights of Donald E. Dill, Cathie G. Dill, Jerry R. Pearce, and Frances M. Pearce in Fremont County.

**Applicants-Appellees:**

Donald E. Dill, Cathie G. Dill, Jerry R. Pearce, and Frances M. Pearce,

v.

**Opposer-Appellant:**

Yamasaki Ring, LLC,

and

**Opposers-Appellees:**

Kevin Rein, State Engineer and Steve J. Witte, Division Engineer, Water Division 2.

**Judgment Affirmed**
*en banc*
February 25, 2019

* * * * *

**Supreme Court Case No. 17SA303**
*Appeal from the District Court*
Pueblo County District Court, Water Division 2, Case No. 12CW95
Honorable Larry C. Schwartz, Water Judge

Concerning the Water Rights of Donald E. Dill, Cathie G. Dill, Jerry R. Pearce, and Frances M. Pearce in Fremont County.

**Applicants-Appellees:**

Donald E. Dill, Cathie G. Dill, Jerry R. Pearce, and Frances M. Pearce,

v.

**Opposer-Appellant:**

Yamasaki Ring, LLC,

and

**Opposers-Appellees:**

Tom French and Joan French,

and Concerning

**Defendants-Appellees:**

Bill Tyner, Division Engineer, Water Division 2 and Kevin Rein, State Engineer.

---

**Judgment Affirmed**
*en banc*
February 25, 2019

---

**Attorneys for Applicants-Appellees:**
Somach Simmons & Dunn
Sarah A. Klahn
 *Denver, Colorado*

**Attorneys for Opposer-Appellant:**
Monson, Cummins & Shohet, LLC
David M. Shohet
Ryan W. Farr
 *Colorado Springs, Colorado*

**Attorneys for Division Engineer and State Engineer:**
Philip J. Weiser, Attorney General
Paul L. Benington, First Assistant Attorney General

Ema I. G. Schultz, Assistant Attorney General
*Denver, Colorado*

No appearance on behalf of Opposers-Appellees Tom French and Joan French.

**JUSTICE SAMOUR** delivered the Opinion of the Court.

3

¶1    This appeal from the water court requires us to travel back in time to the last century. Our destination is January 4, 1909. Upon arrival, we find ourselves in the district court of Fremont County, Colorado, where W. S. Horton and A. W. Alexander are embattled in a water rights dispute. Both are represented by counsel. The Honorable M. S. Bailey is presiding. The centerpiece of the litigation is a water decree entered by Judge Bailey roughly three years earlier (in November 1905) which, among other things, adjudicated Horton's interest in certain water rights for the Campbell Ditch, an irrigation ditch. This 1905 decree, Judge Bailey rules, is "erroneous in the matter of the date fixed therein for the original construction of said Campbell Ditch," and this error, in turn, affects the priorities for the Campbell Ditch's two water rights in Cherry Creek. Therefore, Judge Bailey sets aside and annuls the 1905 decree and enters a new water decree, dated January 4, 1909. But the 1909 decree is not limited to the Campbell Ditch's two water rights in Cherry Creek; rather, consistent with the 1905 decree, it also provides that the Campbell Ditch is "entitled to receive and conduct water" from nine nearby springs.

¶2    It is the water from the nine springs that is at the root of this appeal some 110 years later. The question for us is whether the 1909 decree adjudicates an enforceable water right for the Campbell Ditch in the springs. Yamasaki Ring, LLC, which now owns some of the Campbell Ditch's water rights, asks us to answer the question in the affirmative. The Dills and the Pearces, who own properties where water from the springs has been put to beneficial use since as early as 1903, urge us to answer the question in the negative. In two orders issued in 2016, the water court agreed with the Dills/Pearces and

4

determined that the 1909 decree does not adjudicate a water right in the springs' water because it does not set forth "the necessary information" for adjudication, including an appropriation date, a priority number, or quantification details. Therefore, concluded the water court, the Campbell Ditch's unquantifiable entitlement to "receive and conduct water" from the springs cannot be enforced or administered against any adjudicated water rights. We agree and therefore affirm the water court's judgment.

¶3 We hold that the 1909 decree fails to set forth required indicia of enforceability—including an appropriation date, a priority number, and quantification information—with respect to the springs. Therefore, it does not adjudicate a water right in the springs. Without indicia of enforceability, especially a priority number, the 1909 decree does not adjudicate a water right in the springs that can be enforced or administered vis-à-vis adjudicated water rights. We are not persuaded by Yamasaki Ring's assertion that there was no need for indicia of enforceability because the springs' water was adjudicated as a supplemental/additional source of water for the properly adjudicated water rights that the Campbell Ditch has in Cherry Creek. Without indicia of enforceability, and in particular a priority number, the Campbell Ditch's entitlement to receive and conduct water from the springs cannot be deemed an adjudicated water right that can be enforced or administered against other adjudicated water rights.

## I. Facts and Procedural History

### A. Overview

¶4 Yamasaki Ring owns some of the Campbell Ditch's water rights. The Campbell Ditch is an irrigation ditch built in 1883 that originates at a headgate along the north bank

5

of Cherry Creek.  In 1890, the Campbell Ditch was extended by the Deever's Extension. Some years later, in 1903, the Campbell Ditch was extended again by what later became known as the Horton Extension in order to access water from certain uphill springs. Water from those springs is captured by the Horton Extension and carried downhill to a forty-foot-long metal culvert over Cherry Creek and into a series of ditches that deliver it to the properties owned by the Dills/Pearces.   Without the culvert, water from the springs would flow via the Horton Extension directly into Cherry Creek and to the Campbell Ditch headgate, which diverts water from Cherry Creek.

¶5     The dispute between Yamasaki Ring and the Dills/Pearces revolves around the springs' water.  The parties disagree about whether the decree issued by the Fremont County district court in 1909 adjudicates an enforceable water right for the Campbell Ditch in the springs' water.  To resolve the parties' dispute, we must interpret the 1909 decree.  But before doing so, we take a moment to consider the pertinent events that preceded the issuance of that decree.

### B.  Pertinent Events Preceding the 1905 Decree

¶6     In 1904, Horton filed a "Plat and Statement" ("Plat") of the Campbell Ditch.  In the Plat, Horton claimed three water rights: 2.34 cubic feet per second ("c.f.s.") for the Campbell Ditch from Cherry Creek, 2.34 c.f.s. for the Campbell Ditch (by way of the Deever's Extension) from Cherry Creek, and 2.34 c.f.s. for the Horton Extension from the springs.  According to the Plat, the appropriation date for the springs' water was September 25, 1903.

6

¶7    The following year, Horton filed a petition and statement of claim (hereinafter collectively "Statement of Claim"), which alleged ownership of the water flowing through the Campbell Ditch. The Statement of Claim maintained that the Campbell Ditch was extended by the Horton Extension "from the original headgate further up the stream and to certain springs along the bank thereof, the water of which had not [previously] been diverted either by a ditch or by any natural stream." It further asserted that the Horton Extension had a carrying capacity of 2.34 c.f.s., that construction of that extension began on September 25, 1903, and that the springs' water had been appropriated and "used continuously during each and every year since . . . by and through . . . irrigation . . . to the extent of the entire supply afforded by [the] springs."

## C.  The 1905 Decree Did Not Include Any Indicia of Enforceability with Respect to the Springs

¶8    In 1905, Judge Bailey issued a water decree addressing Horton's Statement of Claim. He found that: (1) all of the springs' water was "appropriated by and through" the Horton Extension, which began to be constructed on or about September 25, 1903; and (2) the evidence supported all the allegations in Horton's Statement of Claim. But these findings were omitted in the concluding paragraphs of the 1905 decree, which set forth Judge Bailey's final orders:

> It is by the Court considered, ordered, adjudged and decreed that there be *allowed to flow into the said The Campbell Ditch* out of the waters of Cherry Creek under and by virtue of an *appropriation of date March 1st, 1882*, being Cherry Creek *Priority Number 1.5* and Arkansas River *Priority Number 263.5*, *2.34 cubic feet of water per second* of time for the use and benefit of said W. S. Horton;

7

That there be further *allowed to flow into said ditch* under and by virtue of an appropriation by enlargement and extension through the Deever[']s Extension out of the waters of Cherry Creek under an *appropriation of date March 1st, 1890*, being Arkansas River *Priority No. 384.7* and Cherry Creek *Priority No. 3*[,] *2.34 cubic feet of water per second* of time for the use and benefit of said W. S. Horton;

It is further adjudged that the said The Campbell Ditch is *entitled to receive and conduct* from a certain spring situate . . . and water from all springs along the line thereof, which runs thence Northeast 7380 feet to the original headgate of The Campbell Ditch . . . .

It is further adjudged and decreed that the said W. S. Horton is the sole owner of said ditch and entitled to receive the water appropriated thereby.

(Emphases added.)

¶9    Notably, as to the two Cherry Creek water rights (the "Cherry Creek water rights"), the 1905 decree specified that the water was "allowed to flow into" the Campbell Ditch, and then included appropriation dates, priority numbers (for both Cherry Creek and the Arkansas River), and quantification information. In stark contrast, with respect to the springs, the 1905 decree simply mentioned that the Campbell Ditch was entitled to "receive and conduct" water, and did not include an appropriation date, a priority number, or any quantification information. Even the format of the decree seemed to distinguish between the Cherry Creek water rights, on the one hand, and the entitlement to receive and conduct water from the springs, on the other. The paragraph setting forth the first Cherry Creek water right started with a declaration that the right was "considered, ordered, adjudged and decreed" by the court. The next paragraph, which addressed the second Cherry Creek water right, seemed to be a continuation of the first paragraph—it started with "[t]hat there be further allowed to flow into said ditch." But

8

the paragraph discussing the springs' water was drafted as though it was meant as a separate order that addressed a different subject matter; it started with "[i]t is further adjudged."

## D. Like the 1905 Decree, the 1909 Decree Does Not Include Any Indicia of Enforceability with Respect to the Springs

¶10 Less than two years after the 1905 decree was issued, Alexander challenged it. In a filing submitted in 1907, he argued that the 1905 decree contained some inaccuracies related to the Cherry Creek water rights. Additionally, Alexander raised issues regarding the springs, including as to their tributary nature and Horton's alleged appropriation. He asserted "that the springs . . . were a portion of the natural flow of said Cherry Creek, and [that] all of the waters whereof had been appropriated prior to [Horton's appropriation date] by [Alexander] and others having decreed rights in [Cherry] Creek." On January 4, 1909, following the presentation of evidence and arguments, Judge Bailey set aside and annulled the 1905 decree and entered a new decree, which he declared "the only decree for said The Campbell Ditch."

¶11 Agreeing with Alexander, Judge Bailey corrected the inaccurate information in the 1905 decree concerning the Cherry Creek water rights—he amended "the matter of the date fixed . . . for the original construction of said Campbell Ditch" and "the numbers assigned to said Ditch, and to its priorities." However, Judge Bailey did not address the issues raised by Alexander concerning the tributary nature of the springs or Horton's alleged appropriation of all of the springs' water supply. Instead, he omitted the findings in the 1905 decree related to those issues—that is, with respect to the appropriation of all

9

of the springs' water through the Horton Extension, the date when construction began

on that extension, and the conclusion that the evidence supported all the allegations in

Horton's Statement of Claim.

¶12 The 1909 decree is otherwise consistent with the 1905 decree:

> IT IS THEREFORE CONSIDERED, ORDERED, ADJUDGED AND DECREED by the Court that said The Campbell Ditch is hereby numbered 316.5, and that there be *allowed to flow into said The Campbell Ditch*, out of the waters of Cherry Creek, under and by virtue of *an appropriation of date March 1st, 1883*, being Cherry Creek *Priority No. 3*, and Arkansas River *Priority No. 282.5, 2.34 cubic feet of water per second* of time, for the use and benefit of said W. S. Horton, and of his grantees claiming by, through and under said W. S. Horton.
>
> That there be further *allowed to flow into said Ditch*, under and by virtue of an appropriation by enlargement and extension through the Deever's Extension, out of the waters of Cherry Creek, under *an appropriation of March 1st, 1890*, being Arkansas River *priority Number 384.7*, and Cherry Creek *Priority Number 4, 2.34 cubic feet of water per second* of time, for the use and benefit of said W. S. Horton, and of his said grantees claiming by, through and under said W. S. Horton.
>
> AND IT IS FURTHER ADJUDGED that said The Campbell Ditch is *entitled to receive and conduct* from a certain spring situate . . . and water from all springs along the line thereof, which runs thence northeast 7380 feet to the original headgate of The Campbell Ditch . . . .
>
> AND IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the said W. S. Horton, and his grantees holding by virtue of titles and claims derived from him, said W. S. Horton, are the sole owners of said ditch, and entitled to receive the water appropriated thereby.

(Emphases added.)

¶13 Like the 1905 decree, the 1909 decree does not include an appropriation date or a

priority number for the springs' water. Nor does it indicate the amount of the springs'

water the Campbell Ditch is entitled to receive. And the format of the 1909 decree does

10

not vary greatly from that of its predecessor: it addresses the Cherry Creek water rights in two connected paragraphs and the springs' water separately.

### E. The Dills/Pearces and Their Predecessors in Interest Have Put the Water from the Springs to Beneficial Use Since as Far Back as 1903

¶14　Having discussed the 1905 and 1909 decrees and relevant events surrounding their issuance, we now turn our attention to the historical use of the springs' water. Has anyone put the water from the springs to beneficial use in the past? And, if so, for how long?

¶15　Through the metal culvert placed upstream from the Campbell Ditch, the Dills started irrigating their properties with water from the springs in 2005 and the Pearces started doing so in 1991. But these properties were irrigated with water from the springs as early as 1953. Even before that, and as early as 1903, the Dills'/Pearces' predecessors in interest used water from the springs continually. Indeed, the water court found that it was in 1903 that they first installed a metal culvert upstream from the Campbell Ditch.[1]

### F. The Curtailment of the Springs' Water Supply to the Properties Owned by the Dills/Pearces and This Litigation

¶16　In 2011, the Division Engineer for Water Division 2 curtailed the water supply from the springs that the Dills/Pearces were using to irrigate their properties. The Division Engineer accomplished this by serving the Dills/Pearces with a cease and desist

---

[1] The predecessors in interest of the Dills/Pearces replaced the original culvert with the culvert that is in place now, which has a manufacture date of 1968.

order prohibiting their use of water from the Horton Extension for irrigation purposes. The curtailment order prevented the springs' water from traveling to the Dills'/Pearces' land, redirecting it instead into Cherry Creek, thereby allowing Yamasaki Ring access to it.

¶17 The Dills/Pearces reacted to the curtailment order by commencing an action against the State Engineer and the Division Engineer (collectively "the State Engineer") in 12CW95. Their complaint sought a declaratory judgment that: (1) "[t]he waters derived from that certain spring situate . . . and water from all springs along the line thereof have always been treated as separate and distinct" from the Cherry Creek water rights; and (2) the water from the springs appears "to be tributary to Stout Creek and not Cherry Creek." Along with their claim for a declaratory judgment, the Dills/Pearces filed a motion for a preliminary injunction. The State Engineer filed an answer and Yamasaki Ring filed both an answer and a statement in opposition.

¶18 Following a hearing, the water court denied the motion for a preliminary injunction. The Dills/Pearces then submitted an application in a separate case, 13CW3041, seeking to adjudicate their water right in the springs.[2] The State Engineer and Yamasaki Ring both filed statements in opposition. Yamasaki Ring also submitted a motion for determination of a question of law in both cases; it asked the water court to

---

[2] The cases were later informally consolidated.

decide "whether the springs[,] as set forth in the 1909 Decree[,] are a decreed supplemental source for the two [Cherry Creek] water rights."

## G. The Water Court's Orders

¶19     In January 2016, the water court issued identical orders in 12CW95 and 13CW3041. The water court disagreed with Yamasaki Ring's assertion that the 1909 decree grants the Campbell Ditch an adjudicated water right in the springs. Finding the decree clear and unambiguous, the water court reasoned as follows:

> The 1909 Decree fails to establish a priority number, date or flow rate for this supplemental water source. Therefore, [Judge Bailey] did not confirm a specific water right attributable to the springs but only decreed an entitlement to receive and conduct the springs' water without adjudicating any appropriation date or priority enforceable or administrable for a water right in the springs.

The water court explained that the 1909 decree "does not contain typical decree language" with respect to the springs' water. The information missing from the 1909 decree, the water court observed, means that the decree fails to "award a priority . . ., . . . [set] acreage for the water's use, and . . . [establish] an amount[,] all things the District Court in 1909 was clearly aware needed to be included in order to decree a separate and distinct water right as shown by the District Court's award for the [Cherry Creek water rights]." Because "there was no specific adjudication . . . made" concerning the springs' water, the water court ruled that Yamasaki Ring does not have an enforceable right in such water.

¶20     In an order issued in September 2016 in 12CW95, the water court clarified its ruling at Yamasaki Ring's request. It reiterated that the 1909 decree "[does] not adjudicate a

13

separate and distinct water right for the springs apart from the [Cherry Creek] water rights" because "the 1909 Decree [does] not set forth the necessary information" or "establish a priority date for the spring water." That the springs' water may be "a supplemental/additional source" for the Cherry Creek water rights did not alter the water court's analysis. As the water court noted, since the entitlement to "the supplemental/additional water from the springs is not enforceable against any . . . adjudicated water right holder," it "cannot . . . be administered as a separate and distinct water right apart from the [Cherry Creek] water rights." Thus, the water court concluded that the 1909 decree gives "the owners of the Campbell Ditch water rights" nothing more than "an unenforceable entitlement to water from the springs when the two [Cherry Creek] water rights are not fully satisfied from diversions from Cherry Creek up to a total of 4.68 c.f.s."[3]

¶21 The Dills'/Pearces' application for a water right in the springs proceeded to a bench trial in 2017 in 13CW3041. After the trial, the water court issued a written order granting the application. The water court determined that the springs' water is tributary to Stout Creek, not Cherry Creek. More importantly, the water court was persuaded by expert testimony that the predecessors in interest of the Dills/Pearces appropriated the water from the springs in 1903, six years before the 1909 decree entered, though no right

---

[3] Each of the Cherry Creek water rights set forth in the 1909 decree involves 2.34 c.f.s. 2.34 + 2.34 = 4.68.

to the springs' water had ever been adjudicated. The water court thus ruled that the Dills/Pearces were "entitled to a decree for 0.46 cfs absolute and 0.54 cfs conditional, for irrigation and domestic purposes." Given the continuous use of the water from the springs by the Dills/Pearces and their predecessors in interest, and given further the findings and conclusions in the two 2016 orders, the water court approved the application by the Dills/Pearces for an adjudicated water right in the springs' water.

¶22 Yamasaki Ring then brought this appeal.[4] The only issue raised is whether the water court erred in determining that "the Campbell Ditch water rights have no legally enforceable right to the springs against any . . . adjudicated water right holder."[5]

## II. Standard of Review

¶23 We review de novo a water court's interpretation of a decree. *Select Energy Servs., LLC v. K-LOW, LLC*, 2017 CO 43, ¶ 12, 394 P.3d 695, 698. A water court's conclusions of law are likewise subject to de novo review. *Grand Valley Water Users Ass'n v. Busk-Ivanhoe, Inc.*, 2016 CO 75, ¶ 21, 386 P.3d 452, 460. But we "accept the water court's factual findings on appeal unless they are so clearly erroneous as to find no support in the record." *Id.*

---

[4] On appeal, the State Engineer agrees with the water court's interpretation of the 1909 decree.

[5] Yamasaki Ring phrases the issue alternatively as follows: whether the water court erred in concluding that the 1909 decree awarded the Campbell Ditch "an 'unenforceable entitlement' to the entire flow of water" from the springs "when the Campbell Ditch water rights are not fully satisfied from diversions from Cherry Creek."

15

## III. Analysis

## A. Relevant Legal Principles

¶24   In Colorado, the water of natural streams is public property and is dedicated to the public's use. *Shirola v. Turkey Cañon Ranch Ltd. Liab. Co.*, 937 P.2d 739, 747–48 (Colo. 1997). But such water is subject to appropriation. *Id.* at 748. An appropriation occurs by virtue of a person taking action that makes beneficial use of water. *Id.*; *see also Farmers High Line Canal & Res. Co. v. City of Golden*, 975 P.2d 189, 198 (Colo. 1999) (explaining that water that has not been applied to a beneficial use cannot be deemed to have "ripened into an appropriation"). A person's appropriation of unappropriated water of a natural stream creates a water right. *Shirola*, 937 P.2d at 748. When an appropriation is established with reasonable diligence through the beneficial use of water, the appropriator's water right vests. *Id.* Our General Assembly has defined a water right as "a right to use in accordance with its priority a certain portion of the waters of the state by reason of the appropriation of the same." § 37-92-103(12), C.R.S. (2018).

¶25   Any individual who holds a water right may file an application with the appropriate water court and request that his or her water right be adjudicated. *Shirola*, 937 P.2d at 748. Following the requisite publication of a resume in the local media, any person may oppose such an application by submitting a timely statement of opposition. *Id.* An adjudicated water right is memorialized in a water decree. *Id.* A water decree does not confer a water right. *Id.* Instead, it "confirms a pre-existing water right, or in the case of conditional applications, gives the applicant the opportunity to develop the right and obtain a priority date that relates back to the date of the first appropriation."

16

*Id.* Stated differently, an adjudication confirms that which has already been accomplished through appropriation. *Cresson Consol. Gold Mining & Milling Co. v. Whitten*, 338 P.2d 278, 283 (Colo. 1959). Importantly, though, while a water right "vests upon appropriation, it is not legally enforceable until it is adjudicated" in a decree. *Shirola*, 937 P.2d at 749.

¶26    When reviewing a water decree, we look first to its plain language. *Select Energy*, ¶ 13, 394 P.3d at 698. "Only if the meaning of the decree is ambiguous" will we "look to extrinsic evidence." *Id.* If the decree is unambiguous, "it cannot be varied by extrinsic evidence." *Farmers High Line Canal*, 975 P.2d at 199 n.14. It follows that, absent a determination of ambiguity, we will not look beyond the four corners of the decree. *Id.* In ascertaining whether a provision in a decree is ambiguous, we examine the decree's language and construe it in accordance with the plain and generally accepted meaning of the words employed. *Id*.

¶27    "[I]t is fundamental that a decree should be complete and certain in itself." *Id.* "It is the decree that recognizes the scope of a water right, and any asserted right must appear on the face of the decree or result from a proper construction of its express provisions." *Select Energy*, ¶ 16, 394 P.3d at 699; *see also Grand Valley*, ¶ 53, 386 P.3d at 466–67 ("[I]f an asserted right exists, it must be found in the language of the decree or at least 'implied from the express provisions of the decree[].'" (quoting *Orchard City Irr. Dist. v. Whitten*, 361 P.2d 130, 136 (Colo. 1961))).

¶28    A water decree must "measure, limit and define both the nature and extent of [the holder's] rights." *Orchard City*, 361 P.2d at 135–36. "Priority, location of diversion at the

17

source of supply, and amount of water for application to beneficial uses are the essential elements of the appropriative water right." *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1148 (Colo. 2001). A water right's priority "is a function of appropriation and adjudication, and is the most important stick in the water rights bundle." *Id.* The goal of adjudication "is to fix the priority of a water right" so that it may be administered against other decreed water rights. *Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson*, 990 P.2d 46, 54 (Colo. 1999).

## B. Application

¶29 Both parties argue that the 1909 decree is clear and unambiguous. And yet, they urge us to reach diametrically opposed conclusions on whether the decree adjudicated a water right in the springs' water. We conclude that the 1909 decree is clear and unambiguous, but we agree with the Dills/Pearces that it did not adjudicate an enforceable water right in the springs' water.

¶30 As the water court aptly noted, the paragraph in the 1909 decree that addresses the springs clearly lacks "typical decree language." It has no appropriation date, no priority number, and no information related to the amount of water for application to beneficial uses. Indeed, it is wholly lacking in indicia of enforceability.

¶31     Significantly, the statutory scheme in effect in 1909 required some of the missing information for the adjudication of a water right.[6]   Colorado has recognized "the interlocking nature of appropriation, adjudication, and administration" since 1879. *Empire Lodge Homeowners' Ass'n*, 39 P.3d at 1149.  Legislative acts enacted in 1879 and 1881 "provided for courts to adjudicate irrigation water rights and the water officials to administer them *in priority*."   *Id.* (emphasis added).   The 1903 Act extended the "adjudication and administration of [water] rights *and their priorities* to all beneficial uses, not just irrigation."  *Id.* (emphasis added).  "The purpose of each of these acts was to make clear that adjudication was required in order to obtain the benefits of *priority* administration."  *Id.*  (emphasis added).

¶32     In 1909, Colorado's statutes required the district court to receive evidence and issue a ruling regarding the adjudication of a water right based on the commencement of a ditch, its original size, its carrying capacity, and the time spent constructing it.  § 3284, C.R.S. (1908).  The same information was required for any enlargement, extension, or re-enlargement of a ditch.  *Id.*  The court was then required to order each water right according to the date of the ditch's construction, the date of the ditch's enlargements or extensions, and "the amount of water which shall be held to have been appropriated by

_____

[6] To the extent the State Engineer argues that the law in effect when the 1909 decree was issued is extrinsic evidence, we disagree.

such construction and enlargements, or extensions, describing such amount by cubic feet per second of time." *Id.*

¶33 Consistent with the law in effect at the time, Judge Bailey included indicia of enforceability in the paragraphs of the 1909 decree that address the Cherry Creek water rights. Each of these rights is accompanied by an appropriation date, priority numbers (with respect to Cherry Creek and the Arkansas River), and quantification information. But with respect to the springs, Judge Bailey did not provide any indicia of enforceability: no appropriation date, no priority number, and no quantification information. Without this information, it is impossible to enforce or administer any water right in the springs vis-à-vis adjudicated water rights.

¶34 We hold that the 1909 decree does not set forth required indicia of enforceability—including an appropriation date, a priority number, and quantification information—with respect to the springs. A decree must "measure, limit and define both the nature and extent" of a water right. *Orchard City*, 361 P.2d at 135–36. The priority, the location of diversion at the supply's source, and the amount of water for application to a beneficial use are all "essential elements of the appropriative water right." *Empire Lodge Homeowners' Ass'n*, 39 P.3d at 1148. Of these, priority "is the most important stick in the water rights bundle" because priority is "a function of appropriation and adjudication," *id.*; indeed, the purpose of adjudication "is to fix the priority of a water right," *Santa Fe Trail Ranches Prop. Owners Ass'n*, 990 P.2d at 54. Absent indicia of enforceability, especially a priority number, the Campbell Ditch's entitlement to receive

20

and conduct water from the springs cannot be deemed an adjudicated water right that can be enforced or administered against other adjudicated water rights.

¶35 Yamasaki Ring insists, however, that it has never claimed "a separate water right" in the springs and, therefore, any argument regarding what constitutes an adjudicated water right is irrelevant to its appeal. According to Yamasaki Ring, because the springs' water is a supplemental or additional "source to the [Cherry Creek] water rights," which no one disputes are properly adjudicated and enjoy indicia of enforceability, "it was unnecessary" for the 1909 Decree to "include an appropriation date, flow rate or other [indicia of enforceability]" with respect to the springs. We are unconvinced by this contention. Without indicia of enforceability, and in particular a priority number, an entitlement to receive and conduct water is not enforceable or administrable against adjudicated water rights. Therefore, it is not an adjudicated water right.

¶36 Still, Yamasaki Ring urges us to declare the Campbell Ditch's entitlement to receive and conduct water from the springs an adjudicated water right based on the 1909 decree's use of the word "adjudged." The word "adjudged" does not alter our analysis. First, Judge Bailey appeared to draw a distinction between the Cherry Creek water rights and the entitlement to receive and conduct water from the springs. Whereas "waters of Cherry Creek" are "allowed to flow into said The Campbell Ditch," the Campbell Ditch is "entitled to receive and conduct . . . water from [the] springs." Further, the Cherry Creek water rights were addressed in connected paragraphs that were qualified by the same phrase: "IT IS THEREFORE CONSIDERED, ORDERED, ADJUDGED AND DECREED by the Court." In contrast, the entitlement to receive and conduct water from

21

the springs was discussed in a stand-alone paragraph that started with the phrase: "AND IT IS FURTHER ADJUDGED."[7]

¶37     Second, and more importantly, that something was "adjudged" is not what matters most to us; it's *what* was "adjudged" that is central to our analysis. As pertinent here, all the decree "adjudged" was the Campbell Ditch's entitlement "to receive and conduct" some unknown amount of water from the springs. That is not the equivalent of an adjudicated water right. Absent a priority number, an appropriation date, and quantification information, any purported right to use the water from the springs cannot be enforced against adjudicated water rights.

¶38     We are equally unmoved by Yamasaki Ring's alternative contention, which invites us to consider extrinsic evidence. Because the plain and generally accepted meaning of the language in the 1909 decree is clear and unambiguous, we do not look to extrinsic evidence. Yamasaki Ring nevertheless maintains that it is appropriate to consider extrinsic evidence to determine whether the language of the decree is ambiguous. We disagree. The rule Yamasaki Ring proposes would swallow the time-honored principle that we consult extrinsic evidence only when the plain language of the decree is ambiguous. Under Yamasaki Ring's approach, extrinsic evidence would always have to

---

[7] We need not discern whether "ADJUDGED" has a different meaning than "CONSIDERED, ORDERED, ADJUDGED AND DECREED." What is of relevance to us is that Judge Bailey appeared to treat the Cherry Creek water rights differently than the entitlement to receive and conduct water from the springs.

22

be considered, even if merely to determine whether an ambiguity exists in the decree. And, where, as here, the decree is clear and unambiguous, a party could inject ambiguity into it through extrinsic evidence.

¶39 Relying on *East Ridge of Fort Collins, LLC v. Larimer and Weld Irrigation Co.*, Yamasaki Ring avers that we have relaxed the longstanding rule related to extrinsic evidence. 109 P.3d 969, 974 (Colo. 2005). But that case is factually distinguishable. There, we interpreted the terms of two contracts for water rights. It was in the context of attempting to ascertain and effectuate *the parties' intent* that we explained that "our courts no longer apply a rigid 'four corners' rule" and that extrinsic evidence is "conditionally" admissible to determine whether the contract, especially an ancient one, is ambiguous. *Id.* Here, we deal with a water decree entered by the district court, not a contract for water rights executed by private parties.

¶40 We do agree with Yamasaki Ring that the pleadings underlying the 1909 decree place the decree in context and are relevant to our interpretation. We have consistently recognized "that statements of claim and transcripts of testimony in adjudication proceedings are admissible evidence in other actions involving the construction or interpretation of water decrees." *Orchard City*, 361 P.2d at 134; *see also Farmers Res. & Irr. Co. v. City of Golden*, 44 P.3d 241, 248 n.6 (Colo. 2002) (same). In *Orchard City*, we observed that a water decree "is not woven of thin air," and is, instead, "a determination of . . . specific issue[s] presented to the court" and "grounded on the facts creating [those] issue[s]." *Orchard City*, 361 P.2d at 134 (quoting *Hinderlider v. Canon Heights Irr. & Res. Co.*, 185 P.2d 325, 327 (Colo. 1947)). Consequently, a decree "must be construed in the

23

light of the facts which gave it birth and limited by the issue[s] it resolved." *Id.* (quoting *Hinderlider*, 185 P.2d at 327); *see also Grand Valley*, ¶ 52, 386 P.3d at 466 (A statement of claim "is akin to a pleading upon which judgment is based, and may be consulted to enable the court to interpret or constrain the decree 'in light of the claimant's own assertion of his demand.'" (quoting *In re Water Rights of Cent. Colo. Water Cons. Dist.*, 147 P.3d 9, 16–17 (Colo. 2006))).

¶41    But the pleadings that gave rise to the 1909 decree actually undermine Yamasaki Ring's position. In the 1905 decree, Judge Bailey found that Horton had appropriated the springs' water on or about September 25, 1903, and was claiming 2.34 c.f.s. from the springs. Alexander challenged these findings in 1907, even though they were not included in the 1905 decree's concluding paragraphs, which set forth Judge Bailey's final orders. More specifically, Alexander maintained that the springs were tributary to Cherry Creek, were part of the natural flow of said Cherry Creek, and had been appropriated before Horton's alleged appropriation date of September 25, 1903, by more senior water right holders, including Alexander. While the 1909 decree, which was issued in response to Alexander's filing, did not address the merits of these contentions, it omitted the challenged findings. We agree with the water court that the most reasonable inference is that Judge Bailey was not convinced in 1909 that Horton had proven his claim to an appropriation of any specific amount of the springs' water for which a priority could be assigned.

¶42    In short, the pleadings underlying the 1909 decree do not support Yamasaki Ring's position. To the contrary, they are consistent with the plain and unambiguous language

24

of the decree. Thus, we conclude that the water court correctly ruled that, under the 1909 decree, Yamasaki Ring does not have an adjudicated water right in the springs; instead, it has "an unenforceable entitlement to water from the springs when the two [Cherry Creek] water rights are not fully satisfied . . . up to a total of 4.68 c.f.s."[8]

## IV. Conclusion

¶43     The water court correctly ruled that the Campbell Ditch's entitlement to receive and conduct water from the springs is not an adjudicated water right. Because we agree with the water court's interpretation of the 1909 decree, we affirm.

---

[8] Yamasaki Ring takes issue with this conclusion because it cannot think of any reason to reference an unenforceable entitlement to water in a decree. We decline to speculate why Judge Bailey made mention of the Campbell Ditch's entitlement "to receive and conduct water" from the springs in the 1909 decree. However, we are satisfied that, whatever Judge Bailey's reason, the 1909 decree did not adjudicate a water right in the springs.

25