Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us.  Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
January 25, 2021

**2021 CO 6**

**No. 20SA32, *Mike & Jim Kruse P'ship v. Cotten*—Water Law—Water Decree Interpretation—Extrinsic Evidence.**

A partnership filed an application with the water court asking it to interpret a 1933 water decree as assigning certain creek water to a ditch.  The water court relied on a 1936 aerial photograph to find that the decree is ambiguous as to whether the creek water is a decreed source.  To resolve the ambiguity, the water court relied on further evidence extrinsic to the 1933 proceedings.  Ultimately, the water court concluded that the water at issue is decreed to the ditch.

The supreme court reverses.  The supreme court identifies some tension in its jurisprudence on decree interpretation but does not resolve that tension because the three available approaches produce the same outcome in this case.  Whether the supreme court examines just the text of the decree, or the decree plus the 1933 testimony and statements of claim, or the decree and all the materials from the 1933 proceedings, the results are identical: The creek water at issue is not decreed to the ditch.  Further, under any of the possible methods of decree interpretation,

evidence extrinsic to the original proceedings is admissible only to resolve an ambiguity, not to create one. Therefore, the water court erred in relying on the 1936 photograph to find the decree ambiguous.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2021 CO 6

### Supreme Court Case No. 20SA32
*Appeal from the District Court*
Alamosa County District Court, Water Division 3, Case No. 17CW3003
Honorable Pattie P. Swift, Water Judge

In the Matter of the Application for Water Rights of the Mike and Jim Kruse Partnership in Saguache County.

**Applicant-Appellee:**

Mike and Jim Kruse Partnership,

v.

**Opposer-Appellants:**

Craig W. Cotten, Division Engineer, Water Division 3; and Kevin G. Rein, State Engineer,

**and**

**Opposer-Appellees:**

The United States of America Fish and Wildlife Service and The Rio Grande Canal Water Users Association,

**and Concerning**

**Intervenor-Appellee:**

S&T Farms, LLC.

---

**Attorneys for Applicant-Appellee:**
Porzak Browning & Bushong LLP
Steven J. Bushong
Cassidy L. Woodard
    *Boulder, Colorado*

**Attorneys for Opposer-Appellants:**
Philip J., Weiser, Attorney General
Philip E. Lopez, Senior Assistant Attorney General
Marc D. Sarmiento, Assistant Attorney General
    *Denver, Colorado*

**Attorneys for Intervenor-Appellee:**
Petros & White, LLC
David S. Hayes
    *Denver, Colorado*

**Attorneys for Amicus Curiae The Rio Grande Canal Water Users Association:**
Carlson, Hammond & Paddock, LLC
William A. Paddock
Mason H. Brown
Katrina B. Fiscella
    *Denver, Colorado*

No appearance on behalf of: The United States of America Fish and Wildlife Service.

**JUSTICE HOOD** delivered the Opinion of the Court.

2

¶1 Water cases frequently call on courts to interpret decisions from bygone eras. By placing a 1933 decree center stage, this case is no exception: Shortly before the decree at issue here took effect, Franklin Delano Roosevelt became president of the United States, proclaiming a "new deal" in part to combat the ravages of the Great Depression, and war-weary Americans debated how much to worry about a political upstart named Adolf Hitler becoming chancellor of Germany. All the while, farmers in the San Luis Valley sought the right amount of water to till their lands.

¶2 Those farmers, at least in the pocket of the Valley we'll discuss, tapped sources that first flowed from the Continental Divide in the San Juan Mountains to the land below. The ditches they deployed for irrigation became fodder for a dispute that reemerges now, the better part of a century later.

¶3 This direct appeal from the District Court for Water Division 3 (the "water court") requires us to decide whether certain creek water is a decreed source for a ditch and whether the water court below improperly consulted extrinsic evidence when it answered that question. The water court conducted a four-day trial with thousands of pages of exhibits and clashing experts to decide the meaning of a decree finalized in April 1933. Grasping for guidance, the water court seized upon a 1936 photograph and declared the decree ambiguous. Then, to cure the

ambiguity, the court consulted additional evidence extrinsic to the original proceedings. Ultimately, it found that the water is decreed to the ditch.

¶4 We reverse. A conflict exists in our case law as to which materials a court may rely on when deciding whether a decree is ambiguous. Some cases say that a court may look beyond the four corners of a decree only when the words on the page are ambiguous. Other cases state that courts may review the statements of claim and transcripts of testimony from the original proceedings to expose latent ambiguities in facially unambiguous decrees. Still others suggest that courts may look at an even greater range of materials from the proceedings that produced the decree. While future litigation may require us to reconcile these cases, we leave that problem for another day. Each method leads to the same result here: The creek water at issue is not decreed to the ditch. And, since the photograph was extrinsic to the proceedings that birthed the decree, the water court erred by relying on it to characterize the decree as ambiguous. Under any of the three interpretive approaches, evidence extrinsic to the underlying proceedings is admissible only after a finding of ambiguity, not to create the ambiguity.

## I. Facts and Procedural History

¶5 The parties dispute whether water from La Garita Creek (the "Creek") that passes through a siphon under a canal is a decreed source for the Rocky Hill Seepage and Overflow Ditch (the "Ditch"). If it is, then the Mike & Jim Kruse

4

Partnership (the "Partnership"), a part-owner of the Ditch, has a right to some of that water.

¶6    The Creek starts in the mountains on the west side of the San Luis Valley and flows east onto the plain. The Creek deposits sediment, and, historically, this sediment piled up, causing the Creek to continually change course and to split into distributaries. Since 1884, the east-flowing Creek has intersected perpendicularly with the north-running Rio Grande Canal (the "Canal").

¶7    To keep Creek water from spilling into the Canal, the Creek was channelized for about a mile west of the Canal and a siphon (the "Siphon") was installed below the Canal to funnel the Creek underneath it and into another channel that continues eastward. The water court found that the Siphon has existed since 1914 and possibly earlier.[1] The picture below (an exhibit at trial) shows the Siphon, where it empties into the eastern channel:

---

[1] According to the water court, the Siphon may have originally existed as a structure that carried water over the Canal. We agree with the water court that this possibility is irrelevant to the disposition of this case.



¶8 The parties disagree about the identity of the eastern channel that starts at the mouth of the Siphon. The Division and State Engineers (the "Engineers") say that it is the continuation of the Creek's channelized bed. The Partnership says that the channel is the Ditch's second branch. Whatever it is, this eastern channel now runs directly into the Ditch, and the water court found that the channel isn't hydrologically connected to a stretch of the Creek that occasionally restarts some three-and-a-half miles east of the Canal.

¶9 On the map below (another trial exhibit), the solid green line depicts the Ditch's current location, although this image reflects the Partnership's position that the segment east of where the Creek intersects the Canal is part of the Ditch:



Figure 1-1
Rocky Hill Seepage and Overflow
Ditch and Vicinity

Source of Rocky Hill Seepage & Overflow Ditch Path:
April 11, 1933 Saguache County District Court Decree and
April 10, 1933 Contract and Definition of Rights in the
Rocky Hill Seepage & Overflow Ditch
Source of La Garita Creek Path:
1982 USGS Topographic Map Del Norte Quadrangle
Source of Background Map:
ESRI World Imagery (12/17/2018)

Trial Exhibit E-098
Case No. 17CW3003

¶10     When the Canal was built, seven decreed diversions existed downstream of the Canal on this part of the Creek. In 1926, the Saguache County District Court granted petitions to move several of these diversion points to the west of the Canal. Those transfers left only three decreed appropriations from the Creek immediately east of the Canal: McLeod Ditches 3, 4, and 5. Today, those three ditches divert water from the contested channel east of the Siphon, and they have appropriation dates of 1878, 1880, and 1880, respectively.

7

¶11 In 1933, the court conducted a general adjudication of water rights in the vicinity of the Canal. Several parties filed competing claims for various ditches, and, after a day of testimony, they informed the court that they had settled. They had executed a contract (the "Contract") that combined several ditches to create the Ditch and that resolved their competing claims to the Ditch's water. They offered the court a stipulated decree, which became the 1933 decree (the "Decree") that controls here.[2]

¶12 The Decree does not mention the Creek or the Siphon; instead, it describes the source of the Ditch as "waste, seepage and spring waters, which are independent of and non-tributary to any natural running stream or water course, and are not capable of being used upon the lands where the waters first arise." The Decree traces the Ditch's layout and locates its three "headgates," which, in this context, refer to termini of the Ditch rather than typical headgates that divert water off a source. It also specifies that the Ditch is entitled to 44.6 cubic feet of water per second with a priority date of November 17, 1891. The Decree assigns the Ditch "Priority No. 1 on its source of supply."

---

[2] The Decree also awards water to two other ditches that aren't relevant to our resolution of this case.

¶13     At the time of the Decree, farmers in this area practiced "sub-irrigation," meaning that they saturated the land so that the groundwater would rise to their crops' roots. Today, however, most of the region's irrigation happens through center-pivot sprinklers, a more water-efficient method. The water court found that this switch has reduced seepage into the Ditch, so that it now depends on Siphon water for most of its supply. Siphon water generally consists of water that has returned to the Creek after use by upstream irrigators, but sometimes it includes untouched Creek water and snowmelt.

¶14     At least from 1975 to 2016, the water commissioner administered the water exiting the Siphon by giving the first 3.77 cubic feet per second to McLeod Ditches 3, 4, and 5 (the three remaining appropriations diverting downstream of the Siphon and with the Creek as their decreed source). The commissioner allowed the balance of the Siphon water to flow down the eastern channel that either connects to the Ditch or is itself part of the Ditch. Thus, the owners of the Ditch have had unfettered access to Siphon water, minus the McLeod diversions, for more than forty years.

¶15     In 2016, the U.S. Fish and Wildlife Service ("FWS") placed a call on the Creek, as it owns another ditch with a headgate on the disconnected stretch of the Creek that restarts much farther east. Soon after that call, the Division Engineer told the owners of the Ditch, including the Partnership, that they have no right to

the water exiting the Siphon because the Decree names only "waste, seepage and spring waters" as sources. When the owners refused to stop taking Siphon water, the Division Engineer had a gate installed to block the Siphon and to redirect the Creek into the Canal. The Division Engineer then tried, but failed, to maneuver the water from the Canal and through other ditches to FWS's ditch.

¶16 The Partnership then filed an application asking the water court to interpret the Decree to include the water that once flowed through the Siphon as a source for the Ditch, with a priority second only to McLeod Ditches 3, 4, and 5.

¶17 At first, the water court ruled that "[t]he [Decree] is clear on its face that [the Creek] is not a source of water for the [D]itch." The court "agree[d] with the Engineers that the [D]ecree would likely mention water being siphoned under the [Canal] and placed in [the Ditch] if that water were intended to be included as a source of the water right under the [D]ecree." The court also noted that, if the Creek had been a decreed source, the correct priority for the appropriation would have been number seventy-five, not number one. Therefore, "under a plain reading" of the Decree, it "could not include [the Creek] as a source."[3]

---

[3] The water court did, however, agree with the Partnership that FWS had no right to call for Creek water. FWS's predecessor in interest had agreed to never claim rights under its priority. Thus, the court found "the Division Engineer [had] attempted to satisfy a call under [a] decreed right which was no longer valid." But

10

¶18    Upon reconsideration, the water court reversed itself. Although the court still believed "the [Decree] is clear on its face that [the Creek] is not a source of water for the [D]itch," it nonetheless found "the [Decree] is ambiguous with respect to" whether the Creek was "an intended source of the [decreed] waste and seepage water." Using logic we decline to detail here because it has since been undermined by the late discovery of an additional filing statement, the court held that the Creek water exiting the Siphon "was what the [D]ecree intended when it granted the [Ditch] the right to divert waste or seepage water."

¶19    Upon further reconsideration, the water court concluded that summary judgment had been inappropriate because the parties disagreed about material facts. The court set the case for trial, where both parties presented evidence extrinsic to the Decree, including dueling historical maps, aerial photographs beginning in 1936, water administration records, pleadings and testimony from pre-1933 litigation, and the Contract.

¶20    In the water court's third and final resolution of this matter, it again acknowledged that "[t]he Decree['s text] unambiguously does not include [the Creek] as a source of water for the [Ditch]" while also finding that the Decree was

that decision (which has not been appealed) has not benefitted the Partnership because the Division Engineer claims that the Siphon water must be used to replenish aquifers for the benefit of junior groundwater users.

11

ambiguous as to whether the Creek was the intended source of the decreed "waste, seepage and spring waters." The ambiguity involved the location of the Ditch's second headgate.

¶21 The Decree describes the location of that headgate "at about the North side of the West Half of the Southeast Quarter Of Section 8, . . . just East of the [Canal]." As shown in the map above, Section 8 is a square mile of land in Saguache County that contains the Siphon. The water court initially observed that "[t]he decreed location of Headgate No. 2 . . . appears to be located approximately one-quarter mile north of the . . . [S]iphon"—the spot marked "Headgate 2 (Decreed)" on the map. But the water court ultimately reasoned "that the [D]ecree language could [also] be construed to place Headgate No. 2 in a variety of locations," including exactly at the Siphon.

¶22 Next, the court relied on evidence extrinsic to the Decree to conclude that the second headgate was, in fact, right at the Siphon in 1933. Specifically, the court pointed to an aerial photograph from 1936 that shows things as they look today; namely, a channel at the Siphon and no other possible branches of the Ditch in Section 8. Placing the second headgate at the Siphon generated the ambiguity: If the headgate was decreed there, that would be an odd place for it unless Siphon water was intended as a source.

12

¶23     Finally, having found the second headgate to be "so located as to capture all the water that empties from" the Siphon, the court addressed the ambiguity by "look[ing] at [more] extrinsic evidence" to determine whether the phrase "waste, seepage and spring waters" was meant to include Siphon water. Ultimately, the water court answered that question in the affirmative, holding that the Decree "entitles the [Ditch] to 44.6 [cubic feet per second] of the water that is siphoned under the [Canal] from the channelized portion of [the Creek], second only to the right of the McLeod Ditches 3, 4, and 5 to 3.77 [cubic feet per second] of that water."

¶24     The Engineers now appeal the water court's order, arguing that the Decree unambiguously excludes the Creek as a source and that the court erred in using the aerial photograph to label the Decree ambiguous.[4]

## II.    Analysis

¶25     After identifying the standard of review, we discuss some tension in our jurisprudence on decree interpretation. We do not resolve that tension here

---

[4] We also have the benefit of briefs from intervenor-appellee S&T Farms, LLC and amicus curiae (and party below) The Rio Grande Canal Water Users Association. S&T Farms asks us to reverse the water court's judgment to protect its water rights upstream of the Siphon and west of the Canal. The Rio Grande Canal Water Users Association argues that the Decree shouldn't be read to compel the Association to supply the Ditch with water left over after irrigation.

because the Decree does not award Siphon water to the Ditch under any method of interpretation available to us under our precedents.

## A. Standard of Review

¶26 "We review de novo a water court's interpretation of a decree. A water court's conclusions of law are likewise subject to de novo review. But we 'accept the water court's factual findings on appeal unless they are so clearly erroneous as to find no support in the record.'" *Dill v. Yamasaki Ring, LLC*, 2019 CO 14, ¶ 23, 435 P.3d 1067, 1074 (citations omitted) (quoting *Grand Valley Water Users Ass'n v. Busk-Ivanhoe, Inc.*, 2016 CO 75, ¶ 21, 386 P.3d 452, 460).

## B. Decree Interpretation

¶27 "[B]y virtue of a person taking action that makes beneficial use of water," an "appropriator's water right vests." *Id.* at ¶ 24, 435 P.3d at 1074. "Any individual who holds a water right may file an application with the appropriate water court and request that his or her water right be . . . memorialized in a water decree." *Id.* at ¶ 25, 435 P.3d at 1074. "It is the decree that recognizes the scope of a water right, and any asserted right must appear on the face of the decree or result from a proper construction of its express provisions." *Select Energy Servs., LLC v. K-LOW, LLC*, 2017 CO 43, ¶ 16, 394 P.3d 695, 699.

¶28 So, if the Partnership has an enforceable right to the Siphon water, that right must derive from the Decree. The parties disagree, however, about how to read

14

decrees. The Engineers say that courts may not consult evidence extrinsic to a decree's text unless the words on the page are ambiguous. The Partnership counters that courts may look at certain extrinsic evidence to contextualize the language of seemingly unambiguous decrees. Both parties can fairly claim that the law is on their side because our case law on ambiguity is itself ambiguous.

¶29 "When interpreting a water decree, this court looks first to the plain language," *id.* at ¶ 13, 394 P.3d at 698, "constru[ing] it in accordance with the plain and generally accepted meaning of the words employed," *Dill*, ¶ 26, 435 P.3d at 1074. This court has sometimes stated that this first step is also the last unless the decree is facially ambiguous: "[A]bsent a determination of ambiguity, we will not look beyond the four corners of the decree." *Id.*; *accord Select Energy*, ¶ 14, 394 P.3d at 698–99 ("Because the decree is unambiguous, we need not look to extrinsic evidence to clarify its meaning.").

¶30 The four corners approach to decree interpretation builds on case law involving stipulations approved by water courts that had implicated "general principles of contract law." *USI Props. E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997); *see City of Golden v. Simpson*, 83 P.3d 87, 93 (Colo. 2004) ("Courts interpret a stipulated change decree as they would interpret a contract. . . . If the terms are clear, a court will neither look outside the four corners of the instrument, nor admit extrinsic evidence to aid in interpretation."); *Farmers High Line Canal & Reservoir*

*Co. v. City of Golden*, 975 P.2d 189, 199 n.14 (Colo. 1999) (involving two court-approved consent decrees for changes in use and reasoning that "[i]t is well-settled that when a document is unambiguous, it cannot be varied by extrinsic evidence").

¶31 We have not, however, addressed whether this approach, grounded in contract law as it is, has been affected by our observation that "our courts no longer apply a rigid 'four corners' rule" to contracts, especially "ancient" ones. *Dill*, ¶ 39, 435 P.3d at 1077 (quoting *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005)). *But see Am. Fam. Mut. Ins. Co. v. Hansen*, 2016 CO 46, ¶ 4, 375 P.3d 115, 117 ("An ambiguity must appear in the four corners of the document *before* extrinsic evidence can be considered.").

¶32 In contrast to the four corners approach, a parallel line of cases has "consistently recognized 'that statements of claim and transcripts of testimony in adjudication proceedings are admissible evidence'" that "place the decree in context and are relevant to our interpretation," even when decrees are facially unambiguous. *Dill*, ¶ 40, 435 P.3d at 1077 (quoting *Orchard City Irrigation Dist. v. Whitten*, 361 P.2d 130, 134 (Colo. 1961)); *accord Grand Valley*, ¶ 51, 386 P.3d at 466 ("[W]e have consistently held that an applicant's statement of claim and the transcripts of testimony in adjudication proceedings are admissible evidence in other actions involving the construction or interpretation of water decrees."); *In re*

16

*Water Rights of Cent. Colo. Water Conservancy Dist.*, 147 P.3d 9, 16 (Colo. 2006); *Farmers Reservoir & Irrigation Co. v. City of Golden*, 44 P.3d 241, 248 n.6 (Colo. 2002).

¶33 This other strand of case law dates back to "the advent of Colorado water law." *In re Water Rights*, 147 P.3d at 16; *see Orchard City*, 361 P.2d at 133–34; *Hinderlider v. Canon Heights Irrigation & Reservoir Co.*, 185 P.2d 325, 327 (Colo. 1947); *Arthur Irrigation Co. v. Strayer*, 115 P. 724, 726 (Colo. 1911); *New Mercer Ditch Co. v. Armstrong*, 40 P. 989, 990 (Colo. 1895) ("These statements [of claim] may be likened to a pleading upon which a judgment is based, and they are proper to be introduced along with the decree, to enable the court to interpret or construe the latter in the light of the claimant's own assertion of his demand.").

¶34 Finally, our case law has sometimes suggested a third approach: Courts may look at materials from the underlying proceeding beyond statements of claim and transcripts of testimony. In *Hinderlider*, we indicated that whatever "evidence upon which [a] decree was based" is admissible. 185 P.2d at 327 ("A decree is not woven of thin air; . . . it must be construed in the light of the facts which gave it birth . . . ."). Indeed, if transcripts of testimony are admissible because they're "part of the permanent records of the [original] court," *Orchard City*, 361 P.2d at 134, the same might fairly be argued for the exhibits referenced in that testimony. And we recently held that certain items could not influence the interpretation of a decree because they hadn't been "before the court in the [original] proceedings

17

and therefore could not have factored into the rights confirmed in the [decree]." *Grand Valley*, ¶ 25, 386 P.3d at 461.

¶35    But we do not have to pick among these approaches today because we reach the same result under all three. Whether we limit our inquiry to the text of the Decree, or we sweep in the statements of claim and the transcript of testimony, or we examine all the materials that were before the 1933 court, we conclude that the Decree unambiguously excludes the Creek water that, until recently, flowed through the Siphon into the Ditch. Since the Decree is unambiguous under all three methods of interpretation, the water court erred in looking at the 1936 photograph. Even under the most expansive interpretive approach, the photograph was inadmissible because it was extrinsic to the 1933 proceedings. Such evidence may be consulted only after a finding of ambiguity, not to create the ambiguity.

## C. The Decree and the 1933 Proceedings Unambiguously Exclude the Creek

### 1. The Decree's Text

¶36    The Decree describes the Ditch's source as "waste, seepage and spring waters, which are independent of and non-tributary to any natural running stream or water course, and are not capable of being used upon the lands where the waters first arise." The Engineers argue that this language unambiguously excludes the Creek water that flowed through the Siphon until the gate was

18

installed. The Partnership claims that this language refers to Siphon water because the appropriators saw the Creek as a nuisance that flooded their lands until they built the Ditch to drain it, and because the Decree places the Ditch's second headgate at or near the Siphon. We agree with the Engineers.

¶37 The first problem with the Partnership's argument is that the Decree doesn't mention the Siphon, which existed in 1933, or even the Creek. It is hard for us to imagine anyone describing the water coming out of the Siphon without mentioning either the Siphon or the Creek that fed water through it.

¶38 Further, it would have been unnatural for the parties to the 1933 proceedings to describe a watercourse funneled through the Siphon as "waste" or "seepage."[5] "Waste water" refers to water, left over after some use, that flows over the land's surface. *See Burkart v. Meiberg*, 86 P. 98, 99 (Colo. 1906) (equating "waste water" with "water which has been spread upon the [land], but not entirely consumed, in the process of irrigation"); *City of Boulder v. Boulder & Left Hand Ditch Co.*, 557 P.2d 1182, 1185 (Colo. 1976) (describing "[t]hat portion [of irrigation water] which is not absorbed into the earth" and "is collected in a waste ditch" as a "typical example" of "waste water"). And the word "seepage," "[a]s understood by Western irrigators" in the early 20th century, "applied particularly to the water

---

[5] The Partnership does not argue that Siphon water is spring water.

19

which begins to appear in spots below irrigation canals and fields cultivated by irrigation" and below other "artificial" sources like reservoirs. 2 Clesson S. Kinney, *Treatise on the Law of Irrigation and Water Rights*, § 1207 (2d ed. 1912); *see Burkart*, 86 P. at 99 (contrasting waste water with "water which, by seepage or percolation, first arises upon . . . lands after having been applied to the irrigation of other lands"). When it reaches the Siphon, the Creek is a creek, not surplus water flowing over the land or pushing up from the ground.

¶39    It is true, however, that Siphon water primarily consists of Creek water diverted and then returned to the Creek by upstream irrigators, but it is immaterial whether this water ever temporarily qualified as waste or seepage during its journey from those fields back to the Creek. Once waste or seepage waters merge into a natural watercourse, "they become part of its volume" and are no longer waste or seepage. *La Jara Creamery & Live Stock Ass'n v. Hansen*, 83 P. 644, 645 (Colo. 1905). For that reason, we interpreted the Spring and Seepage Act, which is now codified at section 37-82-102, C.R.S. (2020), and which governs appropriations of "waste" and "seepage," as inapplicable to waters that have already "reached the channel, or bed, of a natural stream." *La Jara Creamery*, 83 P. at 645. Since the Creek is a natural watercourse, Siphon water isn't waste or seepage.

¶40    The Decree's number one priority date is another textual obstacle for the Partnership. The water court found that the appropriators should have received

20

priority number seventy-five if the Creek had been a source for the Ditch. Taking water from the Siphon is essentially a direct diversion from the Creek, so the number one priority for "waste, seepage and spring waters" is evidence that the Decree does not award Creek water to the Ditch. Further, the Partnership concedes that the Ditch is entitled to Creek water only after McLeod Ditches 3, 4, and 5 receive their decreed Creek water, also through the Siphon. But the Decree is silent on the McLeod appropriations. Given this first-but-second-but-should-be-seventy-fifth-priority conundrum, it is far cleaner to read the Decree as awarding the Ditch priority one on whatever actual "waste, seepage and spring waters" collect there.

¶41 Finally, the water court made much of the Decree's uncertain placement of the Ditch's second headgate because the presence of a headgate at the Siphon would suggest that Siphon water was decreed to the Ditch. But the headgate's imprecise location in the Decree does not amount to ambiguity about the source of the Ditch's water.

¶42 Recall that the Decree puts the Ditch's second headgate "at about the North side of the West Half of the Southeast Quarter Of Section 8, . . . just East of the [Canal]." We agree with the water court and the Partnership that this description doesn't necessarily refer, as the Engineers say it does, to a specific location a quarter mile north of the Siphon (i.e., just east of where the Canal intersects the

21

north side of the west half of the southeast quarter of Section 8). That language could also refer to anywhere just east of the Canal in the north half of the west half of the southeast quarter of Section 8. The bottom line is this: The Decree doesn't foreclose the possibility that the second headgate existed at the Siphon in 1933. But the fact that the Decree does not eliminate the Siphon as the location is not evidence that the headgate was there.

¶43     Moreover, it is unlikely that the Decree would have described the headgate as it did if that's where it was. If the headgate was at the Siphon, why not say so? And why not mention the Creek? We hesitate to interpret the Decree as placing the headgate at the Siphon since the parties that wrote it had the option of describing the headgate's location in terms of conspicuous landmarks but instead expressed the location as "at about" the north side of the west half of the southeast quarter of Section 8, just east of the Canal. Indeed, the reference to the Canal shows that the parties mentioned landmarks when available.

¶44     Lastly, if the Decree does describe a range of possible locations for the second headgate, the Siphon is on the very edge of that zone. We are skeptical that the parties would describe the location of the headgate in terms of an area that just barely includes the Siphon if that's where the headgate was.

¶45     To recap, Creek water emerging from the Siphon isn't waste or seepage; the priority number makes no sense if Creek water were an intended source given the

22

McLeod Ditches' senior priorities to this water; and the textual evidence regarding the second headgate's location suggests the headgate probably wasn't at the Siphon. Thus, the water court was correct: The Decree's text unambiguously excludes Siphon water as a source for the Ditch.

¶46 We now review the 1933 proceedings to see whether they reveal a latent ambiguity in the Decree notwithstanding its plain language. Because they do not, we defer choosing among the competing methods of decree interpretation.

## 2. The Testimony Transcript

¶47 The Partnership argues that L.R. Sims's testimony from the 1933 proceedings sufficiently exposes an ambiguity as to whether the Siphon water is decreed to the Ditch. We disagree, so the resolution of this case does not depend on whether transcripts of testimony are admissible when a decree is facially unambiguous.[6]

¶48 In the 1933 proceedings, Sims filed statements of claim for two of the ditches that the Decree consolidated into the Ditch. He testified that, before he built his section of the Ditch, his land was "watered from . . . one of the branches of the [C]reek," but "there was to[o] much of it" and he "could'nt [sic] control it," so he

---

[6] We do not review the 1933 statements of claim because the Partnership does not argue that they contribute to the alleged ambiguity.

23

"went in and drained it so as to contro[l] the water." The water court relied on this testimony to conclude that the Ditch was built to drain the Creek, which tends to support the possibility that the Decree assigned the Siphon water to the Ditch.

¶49 But Sims also testified that he wasn't familiar with the area until 1905 at the earliest and that he didn't own his land there until 1910 or 1911, so his statements shed little light on the 1891 appropriation that the Decree recognized. *See Harvey v. Davis*, 655 P.2d 418, 421 (Colo. 1982) (dismissing testimony about conditions in the 1930s as poor evidence of the conditions that prevailed when a 1909 decree was entered). Thus, the Sims testimony is weak evidence that "waste, seepage and spring waters" means Siphon water. Indeed, Sims testified that he didn't build this Creek-draining section of the Ditch until 1925, so his testimony doesn't address the scope of the 1891 appropriation that the Decree memorialized.

¶50 Although Sims's testimony does suggest that a distributary of the Creek sometimes drained into the Ditch starting in 1925, we agree with the Engineers that this doesn't reveal an ambiguity in the Decree. Rather, given Sims's timeline and the clarity with which the Decree excludes Creek water, his testimony suggests the existence of an un-decreed water right. The water court seemed to resist that conclusion, doubting that "farmers appropriating water in an arid area such as the San Luis Valley would not appropriate all the water that became available to them." But water rights vest through beneficial use, not availability.

24

*Farmers High Line Canal*, 975 P.2d at 198 ("[A]ward[ing] rates of flow in excess of the amounts necessary for the petitioner's beneficial use . . . is inconsistent with one of the most basic tenets of water law, namely, that water rights are usufructuary."). If the water court's assumption were the rule, the beneficial use requirement would become a nullity.

¶51 Finally, we note that Frank Goudy (a former president of The Rio Grande Canal Water Users Association) testified that he was familiar with the area since 1891 and that the Ditch's "source" was "overflow and seepage water from the irrigation of certain land . . . and certain seepage water developed from irrigation of land through the [Canal]." That explanation is more consistent with the Decree's plain language.

¶52 Thus, the 1933 testimony, which never mentions the Siphon, does not require us to reevaluate our construction of the Decree, the plain text of which excludes Siphon water unambiguously.

### 3. The Contract

¶53 The Partnership also argues that an ambiguity is exposed by the Contract, the agreement executed on the eve of the Decree and then disclosed to the 1933 court. The Contract might be relevant under the third, most expansive, theory of decree interpretation. But we do not have to decide whether this document is

admissible because, even assuming it is, it does not reveal an ambiguity as to whether the Decree awards Siphon water to the Ditch.

¶54 The Partnership points to a passage referencing the signatories' intent "that a Decree be entered to the [Ditch] for all of the waters found to have been developed thereby." Even assuming that some or all of the water exiting the Siphon in 1933 eventually made its way into the Ditch, "developed" is a "term[] of art to the water law" that excludes water that is "naturally part of the river system" like native Creek water. *Ready Mixed Concrete Co. v. Farmers Reservoir & Irrigation Co.*, 115 P.3d 638, 644–45 (Colo. 2005). "Developed water" is "water extracted from an underground source unrelated to the natural flow of the stream." *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 66 n.59 (Colo. 1996); *see* Kinney, *supra*, § 320 (defining "developed water" as water "discovered and developed through the agency of man, and which, under ordinary conditions, would not have appeared at the surface, or have contributed to the flow of any stream or body of water").

¶55 Elsewhere, the Contract allocates among the signatories "all of the waters accumulated" in the Ditch, but that language is equally unavailing because it does not speak to the appropriators' intent in 1891. An agreement in 1933 to divide water that possibly included Siphon water does not inform the scope of the rights the Decree memorialized as having vested more than forty years earlier.

¶56    The Contract does, however, state that the purpose of the Ditch was to "secure adequate surface drainage for [the signatories'] lands, and for the further purpose of controlling and properly distributing the waters *arising* therefrom theretofore overflowing said lands."  (Emphasis added.)  In other words, the purpose of the Ditch was to drain water arising on their lands, not to drain a watercourse like the Creek that descends from the mountains.

¶57    The Contract is insufficiently compelling evidence that the Decree's text conceals an ambiguity.

## D. The Water Court Erred by Consulting Evidence Extrinsic to the 1933 Proceedings

¶58    To summarize, the Decree's text categorically excludes Siphon water as a source for the Ditch, and the 1933 proceedings expose no latent ambiguities that require us to doubt our construction of the Decree.  So ends our work: Under any of the three available approaches to decree interpretation, courts may not look at evidence extrinsic to the original proceedings when, given the admissible materials, the decree is reasonably susceptible to only one interpretation.[7]

---

[7] We also reject the Partnership's contention that this exercise amounts to a collateral attack on the 1933 court's supposed finding that Siphon water is "waste, seepage and spring water."  That argument assumes the Partnership's interpretation of the Decree is right, and we have already concluded that it is not.

27

¶59 The water court erred when it invoked evidence extrinsic to the 1933 proceedings in finding the Decree ambiguous. The court used an aerial photograph from 1936 to definitively place the Ditch's second headgate at the Siphon in 1933. That finding, the court said, made the Decree ambiguous since it suggested Siphon water was a decreed source. In turn, that ambiguity opened the door to further evidence extrinsic to the proceedings. But the Decree is unambiguous based on its text and the 1933 proceedings, so the photograph is irrelevant under any of the three possible interpretative methodologies.

### III. Conclusion

¶60 Because we conclude the Decree and the 1933 proceedings unambiguously exclude the Creek water that previously flowed through the Siphon, we reverse the water court's order and remand the case for further proceedings consistent with this opinion.